HARRY L. EPSTEIN AND ESTELLE EPSTEIN, ET AL.,[1] PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 548–64, 549–64, 1819–64, 1824–64. Filed December 24, 1969.

*John Blyer Callahan* and *Herbert Morse*, for the petitioners.
*Harry Morton Asch* and *Martin Schainbaum*, for the respondent.

HOYT, *Judge:* Respondent determined deficiencies in petitioners'
income and gift taxes and additions to tax under section 6651(a)[2] for
the taxable year 1960 as follows:

| Docket No. | Petitioners | Tax | Deficiency | Additions to tax |
|---|---|---|---|---|
| 548–64 | Harry L. Epstein and Estelle Epstein | Income | $32,477.40 | |
| 549–64 | Robert B. Levitas and Leah A. Levitas | Income | 29,845.27 | |
| 1819–64 | Estelle Epstein | Gift | 3,598.74 | $899.68 |
| 1824–64 | Harry L. Epstein | Gift | 3,598.74 | |

After various concessions by the parties, the following issues remain
for our decision:

(1) Whether the fair market value of the property sold by the
United Management Corp. exceeded the fair market value of the
consideration received by it from the trusts created by the two con-
trolling stockholders of the corporation for their children.

(2) If so, whether the difference between the fair market values of
the properties sold and consideration received would constitute a

<hr />

[1] Cases of the following petitioners are consolidated herewith: Robert B. Levitas and
Leah A. Levitas, docket No. 549–64; Estelle Epstein, docket No. 1819–64; and Harry L.
Epstein, docket No. 1824–64.

[2] All section references are to the Internal Revenue Code of 1954.

constructive distribution of property to the two controlling stockholders of the corporation.

(3) If one of the controlling stockholders was the recipient of a constructive distribution of property, whether the ultimate receipt of such property by the trusts should be treated as a taxable gift from such stockholder to each of such trusts to the extent that no consideration was paid therefor.

(4) Whether Estelle Epstein, who consented on her husband's 1960 gift tax return to have one-half of his gifts considered as having been made by her, is liable for an addition to tax pursuant to section 6651 (a) by reason of her failure to file a gift tax return for 1960.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation and exhibits thereto are incorporated herein by this reference.

Harry L. Epstein and Estelle Epstein, the petitioners in docket No. 548–64, are husband and wife. At the time of the filing of the petition herein, they resided in Shorewood, Wis. They filed a joint Federal income tax return for the taxable year 1960 with the district director of internal revenue at Milwaukee, Wis.

Robert B. Levitas and Leah A. Levitas, the petitioners in docket No. 549–64, are husband and wife. At the time of the filing of the petition herein, they resided in Portola Valley, Calif. They filed a joint Federal income tax return for the taxable year 1960 with the district director of internal revenue at San Francisco, Calif.

Harry L. Epstein, the petitioner in docket No. 1824–64, filed a gift tax return for the taxable year 1960 with the district director of internal revenue at Milwaukee, Wis.

Estelle Epstein, the petitioner in docket No. 1819–64, consented on her husband's gift tax return to have one-half of his gifts considered as having been made by her. She did not file a gift tax return for the taxable year 1960. Of the total amount reported on Harry Epstein's 1960 gift tax return, $1,000 ($500 allocable to Harry and $500 to Estelle) is attributable to gifts of future interests.

During all the time periods involved in these cases, Harry Epstein and Robert Levitas were the controlling stockholders of United Management Corp.

United Management Corp. is engaged in the corporate management services and rental real estate businesses. It elected pursuant to subchapter S of the Internal Revenue Code to be taxed as a small business corporation during its fiscal year ending July 31, 1961, and all time periods involved herein. The balance sheet of United Management Corp. for its fiscal year ending July 31, 1961, shows that its ac-

cumulated earned surplus as of August 1, 1960, was $103,108.99, and its accumulated earned surplus on July 31, 1961, was $103,102.99.

During its fiscal year ending July 31, 1961, and all time periods with which we are concerned, the officers and directors of United Management Corp. were Harry Epstein (president), Robert Levitas (vice president), and Irene Casten (secretary). The stockholders were Harry Epstein (126 shares), Robert Levitas (125 shares), and Irene Casten (1 share). The stated value of the capital stock in United Management Corp. owned by Harry Epstein and Robert Levitas, on September 20, 1960, was $252.

Prior to September 20, 1960, United Management Corp. was the owner of improved real property located at both 1110 North 7th Street, San Jose, Calif. (hereinafter referred to as the San Jose property), and 800–840 Tennessee Street, San Francisco, Calif. (hereinafter referred to as the San Francisco property).

The San Francisco property was acquired at sometime in 1952 at an approximate cost of $225,000. At the time of this acquisition a mortgage was put on the property, such mortgage bearing an interest rate of 4½ percent. The San Francisco property consists of a level lot having dimensions of 188 feet on 19th Street, 201 feet 9 inches on Tennessee Street, and 201 feet 9 inches on Minnesota Street for a total lot area of 37,929 square feet. The property is improved with a two-story building, 50 years of age or older, which, as of September 20, 1960, was in excellent condition and maintenance. The building has a concrete foundation, a first floor built of concrete, and a second floor built of wood. The ceiling height of the ground floor is 18 feet and the ceiling height of the second floor is 20 feet. The ground floor of the building, having brick sidewalls and exposed timber ceiling, is unfinished. The second floor, with an approximate area of 37,000 square feet, had, as of September 20, 1960, an area of 7,274 square feet of finished office space. An additional amount of the unfinished area of the second floor, roughly 2,800 square feet, has since been converted to office space, with appropriate improvements costing approximately $100,000. The property is adjoined on the Minnesota Street side by a railroad spur, approximately 200 feet in length, and has six loading bays on the Minnesota Street side and four loading bays on the Tennessee Street side. The building has two freight elevators, one hydraulic and the other electric.

The San Francisco property is in an area which is zoned for heavy industrial use. There are many other multistoried buildings located in this heavy industrial zone.

As of September 20, 1960, the first floor of the building was used for the distribution of liquor and for the storage of products. The second

floor was used partially for the manufacture of paper boxes and, as mentioned above, partially for office space.

While the first floor of the building is quite adequate in meeting any storage or manufacturing demands made upon it, the second floor fails, in certain functional aspects, to meet such demands. The second floor operation is partially obsolescent due to a poor elevator situation (only two of them) combined with the excessive ceiling height of the first floor (18 feet). This results in increased labor costs. With the advent of industrial parks, in cheaper land areas, and the construction of one-level buildings, the demand in San Francisco and other major cities for second floor space for a storage or manufacturing operation has been greatly curtailed. The one-level type of operation eliminates some of the functional deficiencies inherent in a two-level operation with the resultant benefit of much lower labor costs.

While the second floor of this building is not functionally obsolete as office space, the building is not located in an office rental area and could not yield as much rental income as is normally received in such an area.

The assessed value of the San Francisco property for real property tax purposes as of the year 1965 was $73,510, $22,510 being allocable to the land and $51,000 being allocable to the building. In the San Francisco area the assessed valuation of real estate usually equals 25 percent of the amount the assessor fixes as the fair market value of the real estate.

As of September 20, 1960, there was a lease in effect covering a portion of the ground floor and second floor with lobby entrance at 800 Tennessee Street. This space was leased to Acme Paper Box Co. for 10 years from August 10, 1952, to August 9, 1962, at $950 per month plus 40 percent of any taxes over the 1952–53 taxes of $4,168.02.

As of September 20, 1960, there was a lease in effect covering the north one-half of the ground floor except the entrance lobby to the second floor, with the lessee having the right to use the spur track on Minnesota Street. This space was leased to Electrolux Corp. for a term from March 1, 1952, to February 28, 1962, at $1,060 per month plus one quarter of any tax increase over the 1951–52 taxes of $4,550.27. At sometime prior to September 1960, either in 1959 or early 1960, Electrolux Corp. subleased the above-described part of the building to Acme Paper Box Co., at a loss, for $750 per month.

As of September 20, 1960, there was a lease in effect covering the southerly one-half of that building including both the ground and second floors. This lease was originally entered into by United Management Corp. as lessor with Julliard, Inc., also known as Julliard Alpha Liquor Co. as lessee on January 7, 1955, for a term beginning on February 1, 1955, and ending on January 31, 1958, at a rental of $625

per month. On February 1, 1958, this lease was renewed for a 5-year period ending on January 31, 1963, at a rental of $1,800 per month.

The annual gross rental income of the San Francisco property pursuant to the leases in effect on September 20, 1960, was $45,720. The annual net income from this property, after taking into account various estimated expenses, ranged from $33,175 to $34,550.

In 1960, a willing and informed buyer of improved property similar to that of the San Francisco property, and in the same area thereof, would probably expect an approximate annual net income return of 9 percent on his investment. The land of the San Francisco property had an approximate fair market value of $3 per square foot as of September 20, 1960. The building of the San Francisco property, with its partial use as office space, had an approximate overall fair market value of $2.75 per square foot as of September 20, 1960.

The San Jose property, which is zoned for industrial use, originally consisted of unimproved land which was acquired at an approximate cost of $15,000. In 1955, the land was improved with the construction of a building at an approximate cost of $49,000. The building, as late as 1966, remained in excellent condition and upkeep. This property, located at 1110 North 7th Street, consists of a lot, 250 by 150 feet, less a curve having a radius of 20 feet on 7th Street and 20 feet on Commercial Street, for a total lot area of 37,300 square feet. On the corner of this lot, at 7th and Commercial Streets, there is a one-story tiltup concrete warehouse building which, as mentioned above, was built in 1955. The building, containing approximately 10,400 square feet, has a concrete floor, a woodtruss roof, seven skylights, two steel rollup doors, and four small offices which have accoustical tile ceilings and asphalt floors. The balance of the lot, containing approximately 25,500 square feet, was unimproved as of September 20, 1960.

As of September 20, 1960, there was a lease in effect for the building on the San Jose property. This lease was between United Management Corp. as lessor and Julliard, Inc., also known as Julliard Alpha Liquor Co., as lessee for a period of 10 years from September 1, 1955, to August 31, 1965, at a rental of $700 per month. The annual gross rental income of the San Jose property pursuant to the lease in effect on September 20, 1960, was $8,400. The annual net income from this property, after taking into account various estimated expenses, ranged from $6,110 to $6,280.

In 1960, a willing and informed buyer of improved property similar to that of the San Jose property, and in the same area thereof, would probably expect an approximate annual net income return of 7½ percent on his investment. The cost of the land of the San Jose property in 1952 was approximately 40 cents per square foot. Taking into account the increase in value of the land in this area over the years,

the fair market value of the land of the San Jose property was approximately 75 cents per square foot as of September 20, 1960.

Two of the tenants of the San Francisco property, Acme Paper Box Co. and Electrolux Corp., are not related to any of the petitioners in this case. Julliard, Inc., the only tenant of the San Jose property, and one of the tenants in the San Francisco property, is a corporation owned and controlled by petitioners, Harry L. Epstein and Robert B. Levitas, who are also the controlling shareholders of United Management Corp.

At some time in either late 1959 or early 1960, petitioners Harry Epstein and Robert Levitas decided to sell both the San Francisco and San Jose properties. At this time, they listed the San Francisco property for sale at a price ranging between $300,000 and $325,000 with Milton Meyer & Co., a San Francisco real estate brokerage firm. Milton Meyer & Co. was not successful in securing a buyer for the property. As had been its experience in the past, Milton Meyer & Co. found it very difficult to market an old multi-storied building which was located in an industrial zone. In light of the subleasing of the Electrolux Corp.'s portion of the premises, at a greatly reduced rent, any potential buyer would have anticipated and allowed for a conservative vacancy factor for this type of building.

At sometime prior to June 1, 1960, Robert Levitas contacted Equitable Life Assurance Society in behalf of United Management Corp. requesting a loan for the purpose of refinancing the loans on both the San Francisco and San Jose properties. In connection with this request, an appraisal to ascertain the fair market values of the San Francisco and San Jose properties as of May 25, 1960, was made. The appraisal reports were submitted to Levitas on June 1, 1960. The report on the San Francisco property fixed its value as of May 25, 1960, at $420,000. The report on the San Jose property fixed its value as of May 25, 1960, as $95,000. These appraisals as indicated were obtained in connection with prospective loans.

By a declaration of trust made and executed on September 20, 1960, Harry L. Epstein, as donor or settlor, created trusts for each of his two children known as the Louise Epstein Investment Trust and the Joan Epstein Investment Trust. The declaration of trust provided, *inter alia*, as follows:

### DECLARATION OF TRUST

DECLARATION OF TRUST made on September 20, 1960, by Harry L. Epstein, who, depending upon the content, is hereinafter referred to sometimes as donor and sometimes as trustee.

#### ARTICLE I

The donor hereby declares that he has received in trust by transfer from himself as an individual and that he now holds as trustee the sum of One Thousand

Dollars ($1,000.00). Said sum and all other property which may from time to time be added to the trusts, except as may be specifically designated as being given to one of them, are hereinafter sometimes referred to as the "trust estate".

\*          \*          \*          \*          \*          \*          \*

## ARTICLE V

The trustee shall have full power :

(a) To allot to any share created hereunder an undivided interest in any property constituting a portion of the trust estate ; to make joint investments for such shares ; to make any division or distribution to kind or partly in kind and partly in money, and to determine the value of any property so allotted, divided or distributed ;

(b) To sell at public or private sale, exchange, lease for any period of time not exceeding ninety-nine (99) years, mortgage or pledge any personal property at any time constituting a portion of the trust estate upon such terms and conditions as the trustee shall deem wise ;

(c) To invest any money at any time in the trust estate in such bonds, stocks, notes, real estate mortgages or other securities or in such other property, real or personal as the trustee shall deem wise, without being limited by any statute or rule of law regarding investments by trustees ;

\*          \*          \*          \*          \*          \*          \*

(g) To pay all costs, taxes, expenses and charges in connection with the administration of the trusts created herein, including a reasonable compensation to a corporate trustee and to counsel and agents, and to determine whether such payments shall be charged against principal or income ;

(h) To determine what is "income" and what is "principal" hereunder, provided, however, that : (1) any interest or dividend received by the trustee on any security held hereunder, which is accrued and unpaid at the time of the delivery of such security to the trustee, shall be considered as income ; (2) in the case of securities purchased at a discount the entire subsequent sale price or maturity value shall be credited to principal ; (3) in the case of securities purchased at a premium the trustee shall charge the premium against principal without amortizing the same, and (4) any stock dividend or subscription right which may be declared upon or issued in connection with any stock constituting a portion of the trust estate shall be considered as principal and not as income ;

\*          \*          \*          \*          \*          \*          \*

## ARTICLE VIII

\*          \*          \*          \*          \*          \*          \*

B. Notwithstanding anything herein contained to the contrary, no powers enumerated herein or accorded to trustee generally pursuant to law shall be construed to enable the donor, or the trustee or either of them, or any other person to purchase, exchange, or otherwise deal with or dispose of all or any part of the corpus or income of the trusts for less than an adequate consideration in money or money's worth, or to enable the donor to borrow all or any part of the corpus or income of the trusts, directly or indirectly, without adequate interest or security. No person, other than the trustee, shall have or exercise the power to vote or direct the voting of any stock or other securities of the trusts, to control the investment of the trusts either by directing investments or reinvestments or by vetoing proposed investments or reinvestments, or to reacquire or exchange any property of the trusts by substituting other property of an equivalent value.

C. To the extent that there shall be herein a reservation to the donor or the grant of a power or other provisions, which, or the exercise thereof, would be deemed to constitute any part of the income or corpus of the trust as being the income or chargeable to the donor in his individual capacity or to constitute a part of his estate at death, or the donor to be treated as the owner thereof, then to the extent necessary to avoid such result such reservations, powers and provisions shall be deemed inoperative and of no effect.

### ARTICLE IX

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

B. The donor has been advised of the fact that he may reserve the right to alter, amend and revoke this instrument. Nevertheless, the donor hereby declares that this instrument is irrevocable and not subject to any alteration or amendment; provided, however, that the donor reserves the right to himself and for any other person, from time to time, by inter vivos gift or testamentary disposition, to add property to the trust estate or any of the trusts herein provided for, such added property to be held, administered and distributed as a part of such trust or trusts.

### ARTICLE X

Unless terminated at an earlier time under the provisions hereof, the trusts herein established shall in all events cease and terminate twenty-one (21) years after the death of the primary beneficiary. Upon such termination the trust assets shall be distributed and paid over to the then beneficiary or beneficiaries thereof.

On or about September 20, 1960, Robert B. Levitas, as donor or settlor, made and executed a declaration of trust which created two trusts known as the Judith Lavitas Melvin Trust and the Susan Levitas Trust. Susan Levitas and Judith Levitas Melvin are the children of Robert B. and Leah A. Levitas. With the exception that Robert Levitas is named the trustee and his children the beneficiaries, the declaration of trust executed by Robert Levitas had the same terms as the declaration of trust executed by Harry Epstein.

On or about September 20, 1960, the board of directors of United Management Corp. adopted a resolution to sell to the Louise and Joan Epstein Investment Trusts and the Judith Levitas Melvin and Susan Levitas Trusts one-half interests respectively in the San Francisco and San Jose properties.

By an agreement dated September 20, 1960, United Management Corp. agreed to sell to Harry L. Epstein, as trustee of the Louise and Joan Epstein Investment Trusts, undivided one-half interests in the San Francisco and San Jose properties for a total purchase price of $257,500, $500 down and $500 a year for the years 1962 through 1964, with the balance due in further installments over the years until 1979.

By an agreement dated September 20, 1960, United Management Corp. entered into an agreement to sell to Robert Levitas, as trustee of the Judith Levitas Melvin and Susan Levitas Trusts, undivided one-half interests in the San Francisco and San Jose properties for

a total purchase price of $257,500, on the same long-term installment basis as the Epstein Trust contract.

As part of the sale, United Management Corporation assigned its interests in all the leases in effect on both properties to the buying trusts.

In carrying out the terms of the agreement to sell entered into on September 20, 1960, by United Management and Harry Epstein, trustee, those parties made and executed a contract for deed entitled "Land Contract" dated December 15, 1960. A similar contract was also executed on December 15, 1960, by United Management Corp. and Robert Levitas, trustee. Pursuant to a closing statement, also dated December 15, 1960, the total purchase price to be paid by the buyers, the Louise and Joan Epstein Investment Trusts and Judith Levitas Melvin and Susan Levitas Trusts, for all the ownership interests of United Management Corp. in both properties was $515,000, $95,000 for the San Jose property and $420,000 for the San Francisco property. The balance of the total purchase price remaining to be paid after credit at the closing for earnest money of $1,000 and other adjustments of $2,648.92 was $511,351.08. This unpaid balance of the total purchase price was to be paid in part by the two trusts making the remainder of the principal and interest payments under the outstanding mortgages on the two properties in a total amount of $152,399.87. The unpaid balance of the purchase price after provision for payment by the trusts of the outstanding mortgages was $358,951.21. This unpaid balance of $358,951.21 was to be paid on a deferred installment basis with a total amount of $1,000 being paid in each of the years 1962 through 1964; $21,700 being paid in each of the years 1965 through 1974; $26,700 being paid in each of the years 1975 through 1978; and the total balance of $32,151.21 being paid in 1979. There is no provision for payment of interest in any of the documents relating to the sale on the deferred unpaid balance of $358,951.21.

Respondent's notice of deficiency to Harry and Estelle Epstein in regard to their jointly filed income tax return for the taxable year 1960 provided, *inter alia*, as follows:

(c) It is determined that you realized dividend income in the amount of $51,551.50, computed as shown in Exhibit A, which you failed to report on your income tax return. Accordingly, your taxable income is increased $51,551.50.

(d) It is determined that you realized a long term capital gain in the amount of $338.49, computed as shown in Exhibit A, which you failed to report on your income tax return. Accordingly, your taxable income is increased $338.49.

Respondent's notice of deficiency to Robert and Leah Levitas in regard to their jointly filed income tax return for the taxable year 1960 provided, *inter alia*, as follows:

(b) It is determined that you realized dividend income in the amount of $51,551.49, computed as shown in Exhibit A, which you failed to report on your income tax return. Accordingly, your taxable income is increased $51,551.49.

(c) It is determined that you realized a long term capital gain in the amount of $13,651.92, computed as shown in Exhibit A, which you failed to report on your income tax return. Accordingly, your taxable income is increased $13,651.92.

Identical exhibits were attached to both the Epstein and Levitas notices reflecting the determinations as follows:

### EXHIBIT A

| | | |
|---|---:|---:|
| Fair market value of [land and] buildings acquired from United Management Corp | | $515,000.00 |
| Adjustment at transfer date | | 2,648.92 |
| | | 512,351.08 |
| Earnest money | | 1,000.00 |
| | | 511,351.08 |
| Mortgages assumed: | | |
| Equitable Life Assurance Society | $123,159.87 | |
| Equitable Life Assurance Society | 29,240.00 | 152,399.87 |
| Balance | | 358,951.21 |
| Present value [at a 5% rate of discount] or [land] contract [For deferred unpaid balance of $358,951.21 without any provision for payment of interest] * * * | | 200,988.51 |
| | | 157,962.70 |
| Dec. 31, 1960, earnings and profits of United Management Corp. determined to be a dividend | 103,102.99 | * * * |
| One half applicable to you | 51,551.49 | |
| Balance of distribution | | 54,859.71 |
| [$157,962.70–$103,102.99] | | |
| Basis of stock | | 252.00 |
| | | 54,607.71 |
| One half applicable to you [long-term capital gain] | | 27,303.85 |
| Recognized at 50% | | [3] 13,651.92 |

Respondent's notice of deficiency to Harry Epstein in regard to his gift tax liability for the taxable year 1960 provided, in material part, as follows:

It is determined that the transfer of property constructively received by you to the Louise Epstein and Joan Epstein investment trusts constituted a gift. It is further determined that the amount of such gift is $78,981.35 computed as follows:

---

[3] In the Epstein Schedule A an additional adjustment for proceeds from sale of warehouse receipts was made. The parties have stipulated as to the proper treatment of these proceeds, so that the amount was reduced from $13,651.92 by $13,313.43 to $338.49 for 1960.

| | | |
|---|---:|---:|
| Fair market value of [land and] building acquired from United Management Corp | | $515, 000. 00 |
| Less: Adjustment at transfer date | | 2, 648. 92 |
| | | 512, 351. 08 |
| Less: Earnest money | $1, 000. 00 | |
| Mortgages assumed | 152, 399. 87 | |
| Present value [at a 5% rate of discount] of land contract | 200, 988. 51 | 354, 388. 38 |
| Excess of fair market value of [land and] building over encumbrances | | 157, 962. 70 |
| 50% attributable to you | | 78, 981. 35 |

In light of the consent by Estelle Epstein on her husband's 1960 gift tax return to have one-half of the gifts considered as having been made by her, respondent in his notice of deficiency to Harry, only treated one-half of the $78,981.35, or $39,490.68, as the amount taxable to Harry in the computation of his corrected gift tax liability. Accordingly, in his notice of deficiency to Estelle Epstein in regard to her gift tax liability for the taxable year 1960, respondent treated the other half of the $78,981.35, or $39,490.67, as the amount taxable to Estelle in the computation of her corrected gift tax liability. Respondent also determined that, in light of the failure of Estelle to file a gift tax return for the taxable year 1960, a 25-percent addition to tax, in accordance with section 6651(a), be added to her corrected gift tax liability.

### ULTIMATE FINDINGS OF FACT

The fair market values of the San Francisco and San Jose properties as of September 20, 1960, were $325,000 and $95,000, respectively.

### OPINION

By separate declarations of trust made and executed on September 20, 1960, petitioners Harry Epstein and Robert Levitas, the two controlling stockholders of United Management Corp., each created two trusts for the benefit of their children. On that same date, United Management Corp. sold two of its rental properties to the newly created trusts. The issues presented upon these facts are:

(1) Whether the fair market value of the properties sold by United Management Corp. to the trusts exceeded the fair market value of the consideration received by it from such trusts.

(2) If so, whether the difference between the fair market values of the properties sold and consideration received constitutes a construc-

tive distribution of property to petitioners Harry Epstein and Robert Levitas.

(3) If he was the recipient of a constructive distribution of property, whether the ultimate receipt of such property by the trusts should be treated to the extent that no consideration was paid therefore, as a taxable gift from Harry Epstein to each of such trusts.

An additional issue is whether Estelle Epstein, who consented on her husband's 1960 gift tax return to have one-half of his gifts considered as having been made by her, is liable for an addition to tax pursuant to section 6651(a) by reason of her failure to file a gift tax return for 1960.

We are dealing with a sales transaction between four trusts and a corporation. The trustees of the trusts and the controlling stockholders of the corporation in this transaction happen to be the same persons, petitioners Harry Epstein and Robert Levitas. As respondent suggests, and we readily agree, it would be difficult to characterize this as an arm's-length transaction. In dealing with transactions such as this, which have obviously not been at arm's length, it is quite unrealistic to accept without further inquiry the contracts and other documents evidencing the transactions as embodiments of the substance of what has actually transpired. Yet, this is what respondent would have us do, at least up to a certain point.

According to the closing statement, dated December 15, 1960, the total stated purchase price of $515,000 consisted of $95,000 for the San Jose property and $420,000 for the San Francisco property. Respondent, citing *Commissioner* v. *Danielson*, 379 F. 2d 771 (C.A. 3, 1967), reversing 44 T.C. 549 (1965), contends that petitioners should not be allowed to unilaterally reform their contractual agreements and that, accordingly, the purchase price allocations of $95,000 and $420,000 should be held by this Court as the respective fair market values of the San Jose and San Francisco properties as of the date of sale.

We fail to see the applicability of *Danielson* to the case before us. Neither the preliminary contract of September 20, 1960, nor the land contracts subsequently executed on December 15, 1960, contained any allocation of purchase price between the properties. All that the written agreements before us here reflect is that each trust was to pay $257,500 for an undivided one-half interest in the two properties on a long-term installment basis. How much was to be paid is not the issue. We are not concerned here with the attempted reformation by petitioners of a contract as was the case in *Danielson*, nor are we dealing here with parties of opposing economic and tax interests. *Danielson* nowhere suggests that the stated consideration in a contract for a covenant not to compete is its fair market value. We see no justification for the conclusion that the stated prices contained in a closing statement represent the respective fair market values of the San Jose and San

Francisco properties as of September 20, 1960; this is more patently true in light of the fact that the prices as set by the contracts were for long-term payments over a 20-year period.

Petitioners contend that the total purchase price of $515,000 does not represent the joint fair market values of the two properties as of the date of sale, but also includes an amount for interest in that the purchase price was to be paid off over the years through 1979 without interest specified. We do not find this assertion implausible. The designation of "purchase price" in a contract such as this, where the amounts owing thereunder are to be paid off over a period of years, does not necessarily reflect the fair market value or values of the property sold as of the date of sale. Under the particular circumstances of this case, we must look beyond the terms of the written documents involved here to the other evidence presented by both parties as to the fair market values of these properties as of the date of sale.

Respondent contends that the fair market values of the San Francisco and San Jose properties were, respectively, $420,000 and $95,000, as of the date of sale, because the total consideration for the sale was $515,000 and these were the respective prices allocated by the parties to the sale. He does not agree that this contract price should be discounted because a large portion thereof was to be paid in installments over 20 years. However, he does contend that since part of the consideration for these two properties was represented by the buyer's promise to pay $358,951.21 on a deferred basis through the year 1979, this should be discounted in computing the amount of consideration paid. Applying a 5-percent rate of discount to these installment obligations, respondent asserted that the present value of such obligations in the year of sale was $200,988.51. He thus seeks to adhere to contract price, undiscounted, and to reduce consideration paid by the discount he selected.

The other considerations received by United Management from the trusts included a cash downpayment of $1,000, closing adjustments of $2,648.92, and the assumption of existing mortgages on the transferred properties of $152,399.87. Taking into account the discounted value of the installment obligations and the other consideration listed above, respondent determined that United Management Corp. received $357,-037.30 in value from the trusts in consideration for property having a joint fair market value of $515,000, the contract purchase price, undiscounted in spite of the fact that it was to be paid over 20 years, without interest.

Petitioners contend, on the other hand, that the fair market values of the San Francisco and San Jose properties were, respectively, $300,000 and $60,000, as of the date of sale. They further contend that a 4½-percent rate of discount, as opposed to respondent's asserted rate of 5 percent, would be more appropriate in determining the present

value of the installment obligations given by the trusts.[4] With the application of a 4½-percent rate of discount to the installment obligations, as opposed to 5 percent, petitioners conclude, after taking into account the other consideration received from the trusts, that United Management Corp. received $374,048.79 in value in consideration for property having a joint fair market value of $360,000. We will first address our attention to the determination of the fair market values of the two rental properties as of the date of sale, September 20, 1960, and then deal with the question of which rate of discount, either 4½ percent or 5 percent, should be applied in determining the present value of the installment obligations.

At trial, petitioners presented four expert witnesses and respondent presented one expert witness, all of whom testified as to the fair market values of the two properties as of the date of sale. The testimony of these witnesses involved a multitude of facts and figures dealing with comparable sales in the same area as the subject properties (primarily the San Francisco property), comparable percentages of income return on investment in similar properties, and the cost of replacement of the subject properties. These witnesses gave their opinions on the physical condition and functional obsolescence, if any, of the subject properties. We also heard testimony on the unsuccessful attempts of a real estate brokerage firm, with which the San Francisco property was listed for sale in early 1960, to sell that property before September 20, 1960, at a price ranging between $300,000 and $325,000. The Court also inspected and viewed that property at respondent's request.

Our analysis of all the expert testimony and other evidence to fix value has beeen guided by what has been judicially established as the definition of "fair market value": The price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both being reasonably informed as to all relevant facts. *O'Malley* v. *Ames*, 197 F. 2d 256 (C.A. 8, 1952); *Lester E. Dellinger*, 32 T.C. 1178 (1959).

Using our best judgment and carefully considering all of the evidence before us, which we will not recount in detail, we conclude and hold that the fair market value of the San Francisco property, as of September 20, 1960, was $325,000. Petitioners have introduced ample evidence to establish this value as of the crucial date.

Our examination of the evidence regarding the San Jose property shows a recently constructed building with a long and steady income potential. It also shows a fast rising rate of appreciation in land values in the particular area involved. The evidence presented by petitioners fails to show that the fair market value of this property

---

[4] Petitioners do not contest, and we therefore will not consider, the validity of respondent's treating the discounted value of the installment obligations, as embodied in the land contracts, as having been received by United Management Corp. in the year of sale.

as of September 20, 1960, was less than $95,000. We conclude and hold that the San Jose property had a fair market value of $95,000 when it was sold and we therefore uphold respondent's determination with respect thereto.

In his notices of deficiency to petitioners, respondent determined that the date-of-sale value of the deferred unpaid balance due was $200,988.51. The parties are in accord that this value was computed by applying a 5-percent rate of discount. Petitioners must overcome the presumption of correctness which attaches to respondent's determination if they are to succeed in their contention that 4½ percent is the proper rate of discount to be applied; they have failed quite markedly to do so. The only evidence adduced by petitioners with respect to this point was that the rate of interest being paid on the mortgages in effect at the time of sale on the subject properties was 4½ percent. The interest rates of the existing mortgages on the subject properties in years prior to the year of sale do not in any way establish what the prevailing rate of discount was in such year of sale. The San Francisco property was mortgaged in 1952 and the San Jose property was also apparently mortgaged a considerable time prior to the year of sale. Petitioners have not offered any evidence as to what the prevailing rate of discount was in 1960. Accordingly, respondent's determination resulting from the application of a 5-percent discount must be sustained and we cannot accept petitioner's argument that a 4½-percent rate should be applied.

A comparison of the joint fair market value of the two subject properties and the total combined fair market value of the consideration received from the trust discloses a net difference of $62,962.70, computed as follows:

*Property transferred by United Management Corp.*

| | | |
|---|---:|---:|
| Fair market value of San Francisco property | | $325,000 |
| Fair market value of San Jose property | | 95,000 |
| Total fair market value of property transferred by United Management Corp. | | 420,000 |

*Consideration received by United Management Corp.*

| | | |
|---|---:|---:|
| Earnest money | $1,000.00 | |
| Closing adjustments | 2,648.92 | |
| Assumption of outstanding mortgages | 152,399.87 | |
| Present value, using discount factor of 5 percent, of deferred-payment obligations | 200,988.51 | |
| Total fair market value of consideration received by United Management Corp. | | 357,037.30 |
| Excess of fair market value of property transferred over that received | | 62,962.70 |

Having concluded that the fair market value of the property transferred by United Management Corp. to the trusts exceeded the fair market value of the consideration received by it, we must now determine the tax consequences, if any, which flow from this situation.

Respondent contends that the sale between United Management Corp. and the trusts was a "bargain sale" within the purview of section 1.301–1(j), Income Tax Regs., which provides, in pertinent part, as follows:

(j) *Transfers for less than fair market value.* If property is transferred by a corporation to a shareholder which is not a corporation for an amount less than its fair market value in a sale or exchange, such shareholder shall be treated as having received a distribution to which section 301 applies. In such case, the amount of the distribution shall be the difference between the amount paid for the property and its fair market value. * * *

Pointing out that the transfer here was from a corporation to non-shareholder trusts, petitioners contend that the regulation, which on its face deals only with transfers to shareholders, is inapplicable to the situation at hand. Citing *V. U. Young*, 5 T.C. 1251 (1945), as precedent, respondent counters that the regulation still finds application in a situation such as the one before us.

*Young* involved, *inter alia*, the application of the principles of *Helvering* v. *Clifford*, 309 U.S. 331 (1940),[5] which operated to treat the petitioner therein as indistinguishable for income tax purposes from the trusts he created. This led to the ultimate holding in *Young* that the predecessor regulation of section 1.301–1(j) was applicable and controlling under the facts of that case.

We do not find it necessary to explore the intricacies of sections 671–678, the codification of the Clifford doctrine, as they might apply in relating the facts of the case before us to the provisions of regulation section 1.301–1(j); neither, for that matter, did either of the parties to this case find it so necessary. Various cases have established a broader basis for holding that the transaction in question resulted in a constructive distribution to petitioners, without relation to or reliance upon the above-mentioned regulation.

The device of having a corporation make a transfer of property, for no or insufficient consideration, to a person other than a stockholder has not been too successful in avoiding dividend treatment to the stockholder whose own purposes have been satisfied by such transfer. It has been long recognized that where a corporation has made such a transfer to a member of the stockholder's family, whether it be directly or in trust, the stockholder has enjoyed the use of such property no less than if it had been distributed to him directly. *Percy*

---

[5] Secs. 671–678 essentially represent the codification of the Clifford doctrine.

*H. Clark*, 31 B.T.A. 1082 (1935); *Byers* v. *Commissioner*, 199 F. 2d 273 (C.A. 8, 1952), affirming a Memorandum Opinion of this Court. The *Clark* case involved a corporate transfer of property to trusts created by a controlling stockholder for the benefit of his children. As to the issue of whether this transfer should be treated as a distribution to the controlling stockholder, the Court (pp. 1084–1085) made the following disposition:

> The petitioner controlled the Willoughby Co. It acted solely to accommodate him in making the transfer. He enjoyed the use of the property by having it transferred for his own purposes. This was the use he wanted to make of the property. He would have enjoyed it no more had it been distributed to him directly. The surplus of the corporation was wiped out. For income tax purposes the transaction amounted to the distribution of a taxable dividend, to the extent of the earnings mentioned. * * *

In the purported sale here involved, we have already determined that the fair market value of the property transferred by United Management Corp. to the trusts exceeded the fair market value of the consideration received by it in the amount of $62,962.70. Put another way, $62,962.70 of the property was transferred by United Management Corp. to the trusts for no consideration. To this extent, therefore, petitioners, in their control of United Management Corp., have enjoyed the use of that part of the property by having it transferred for their own purposes to the trusts created by them for the benefit of their children. They would have enjoyed this no more had it been distributed to them directly. *Percy H. Clark*, *supra*. It is our holding, accordingly, that the transfer of property from United Management Corp. to the trusts created by petitioners for the benefit of their children, constituted, to the extent that the corporation received less than full consideration from such trusts, a constructive distribution of property to the petitioners.

In addition to contending that the transaction here resulted in a constructive distribution of property to petitioners, respondent also contends, but only with respect to petitioner Harry Epstein, that such transaction resulted in a taxable gift from Epstein to the two trusts to be created. This contention only relates to Epstein's one-half allocable share of the total amount determined initially to be a constructive distribution both to him and to Levitas.

Petitioner Epstein's only contention with respect to this issue is that he was not the recipient of any constructive distribution of property, and could not, therefore, have made a taxable gift to the trusts. We have already decided that Epstein was the recipient of a constructive distribution of property, thus eliminating his contention with respect to respondent's assertion of gift tax liability.

By virtue of his control over United Management, Harry Epstein has caused such corporation to sell, at less than full consideration, a one-half interest in certain of its properties to the trusts created by him for the benefit of his children. We cannot let the form in which this transaction was cast obscure the fact that Epstein has, for all practical purposes, withdrawn property from the corporation he controls, to the extent that such corporation did not receive full consideration from the children's trusts, and, in turn, has made a transfer of such property to such trusts.

Pursuant to the terms of the trust declarations, the trusts were irrevocable and not subject to any alteration or amendment. Upon the termination of such trust, after 20 years, the corpora thereof were to be distributed to Epstein's children. Petitioner Epstein has not contended, nor can we find, that any of the trust provisions, including those relating to Epstein's powers as a trustee, resulted in such retention by him of any dominion or control over the trusts as would preclude the imposition of gift tax liability on any transfers to such trusts. Epstein's filing of a gift tax return with regard to the initial transfers to the trusts only adds further support to this conclusion. Accordingly, we must sustain respondent's assertion of gift tax liability on the transaction here involved.

The final issue presented for decision is whether Estelle Epstein, who consented on her husband's Harry's 1960 gift tax return to have one-half of his gifts treated as having been made by her, is liable for a delinquency addition pursuant to section 6651(a) by reason of her failure to file a gift tax return for 1960.

Section 25.2513–1(c), Gift Tax Regs., provides as follows:

If a husband and wife consent to have the gifts made to third party donees considered as made one-half by each spouse, and only one spouse makes gifts during the year, the other spouse is not required to file a gift tax return provided: (1) The total value of the gifts made to each third party donee is not in excess of $6,000, and (2) no portion of the property transferred constitutes a gift of a future interest. If a transfer made by either spouse during the year to a third party represents a gift of a future interest in property and the spouses consent to have the gifts considered as made one-half by each, a gift tax return for such year must be filed by each spouse regardless of the value of the transfer.

It is a stipulated fact that $1,000 of the total gifts reported on Harry Epstein's gift tax return for 1960 constituted gifts of future interests, thus bringing into application the above-quoted gift tax regulation requiring the filing of gift tax returns by each of the spouses. Although she consented on her husband's return to have the 1960 gifts considered as made one-half by each spouse, Estelle Epstein failed to file a separate gift tax return herself.

Section 6651(a) provides in pertinent part, as follows:

SEC. 6651 FAILURE TO FILE TAX RETURN

(a) ADDITION TO THE TAX.—In case of failure to file any return required under authority of subchapter A of chapter 61 [which includes section 6019 requiring gift tax returns] * * * on the date prescribed therefor * * * unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate.

Estelle Epstein has the burden of showing that the failure to file the required gift tax return was due to reasonable cause and not to willful neglect. *Welch* v. *Helvering*, 290 U.S. 111 (1933); *C. Fink Fischer*, 50 T.C. 164, 177 (1968). She has failed to present any evidence as to why no return was filed and, accordingly, respondent's determination of an addition to tax pursuant to section 6651(a) must be sustained, but the amount thereof recomputed in accordance with this opinion.

*Decisions will be entered under Rule 50.*