PROGRESSIVE ENGINEERING, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent KENNETH P. SWANSON and GRAYCE F. SWANSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Progressive Engineering, Inc. v. Commissioner
Docket Nos. 2956-73, 2957-73.
United States Tax Court
T.C. Memo 1975-82; 1975 Tax Ct. Memo LEXIS 283; 34 T.C.M. (CCH) 411; T.C.M. (RIA) 750082; March 31, 1975, Filed David *284 R. Andelman and Jonathan J. Margolis, for the petitioners. Barry J. Laterman, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: 1969
1970
Progressive Engineering, Inc.
(taxable year ending 10/31)
$ 6,589.00
$3,161.00
Kenneth P. Swanson and Grayce F.
Swanson (calendar year)
40,949.85
2,606.82 The issues for decision are whether the corporate petitioner is entitled to depreciation and operating expense deductions and an investment credit with respect to an alleged one-half interest in a yacht [1] and whether the individual petitioners received constructive dividends growing out of the purchase and use of the yacht. FINDINGS OF FACT Some of the facts are stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. *285 Petitioners Kenneth P. Swanson and Grayce F. Swanson (hereinafter referred to as Ken and Grayce, or the Swansons) are husband and wife. At all times material to these proceedings they resided in Fort Lauderdale, Florida. They filed joint Federal income tax returns for 1969 and 1970 with the Internal Revenue Service Center, Chamblee, Georgia. Petitioner Progressive Engineering, Inc. (hereinafter referred to as Progressive) is a Massachusetts corporation whose principal office was located in Rockland, Massachusetts, at the time its petition was filed. Progressive filed Federal income tax returns for its taxable years ending October 31, 1969 and October 31, 1970 with the Internal Revenue Service Center, Andover, Massachusetts. Progressive was organized in 1953 and is engaged in the manufacture and sale of textile machinery systems and parts. At all material times, Grayce owned 62.5 percent of Progressive's issued and outstanding stock and the remaining 37.5 percent was owned by persons unrelated to the Swansons. Ken was president of Progressive during the years in issue, and Grayce was treasurer. Ken has worked as a textile machine and tool designer since 1926. He does all of Progressive's *286 design work. Progressive has made use of at least a dozen patents issued with respect to his inventions. Progressive maintained its main manufacturing facility and general offices in Rockland, Massachusetts. It had a smaller manufacturing, service, and sales facility and an apartment for use by its employees in Greenville, South Carolina. Its customers were textile mills located in 23 states, concentrated primarily in the southeastern part of the United States. Prior to May 8, 1969, the Swansons owned a series of pleasure boats, the last being Top Roll, a 43-foot Corinthian Double Cabin Chris Craft. On or about May 8, 1969, Top Roll II was purchased for a total price of $115,639.20. Top Roll II is a 48-foot Alglas motor boat with cockpit. The Swansons paid one-half of the purchase price, or $57,819.60, which included a trade-in allowance of $35,000.00 on their boat Top Roll. The remaining $57,819.60 was paid by Progressive, with the knowledge of other officers and shareholders. In April 1970, $3,190.00 was spent to purchase radar equipment for Top Roll II. One-half of this amount was paid by the Swansons and the other half by Progressive. During the taxable years in issue, the *287 Swansons also paid one-half the yacht's operating costs and Progressive paid the other half. Progressive claimed business expense deductions for the amounts it paid and took depreciation in both years. Progressive also claimed an investment credit with respect to the yacht for its taxable year ended October 31, 1969. The Swansons were indicated as the purchasers of Top Roll II on the seller's purchase order and invoice. They applied for a certificate of title in their own names, certifying that there were no outstanding liens on the boat. Under the heading "Use of Boat" on this application, they checked the box marked "Pleasure" and not those marked "Commercial," "Dealer," or "Manufacturer." Insurance was procured on the boat with Ken as the named insured. On their Federal income tax return for 1969, the Swansons claimed a deduction of $2,909.20 for the full amount of Florida sales tax paid upon the acquisition of Top Roll II. [2] They also claimed nonhighway-use gasoline tax credits for the gasoline used by the yacht in both years, while Progressive claimed none. Progressive listed its investment in the yacht as an asset on its certified financial statements, annual reports to the *288 Commonwealth of Massachusetts, and its Federal income tax returns. During 1969 and 1970, Ken was involved in designing a new product to be manufactured by Progressive. This was a device which could be attached to existing textile spinning machinery so that new types of yarn, which were in high demand, could be produced without the purchase of costly new equipment. There was a ready market for such a device. Several different models of spinning machinery were then in use, and a different change over device had to be designed for each model. Ken was unable to procure plans for these machines from their manufacturers, who were in competition with Progressive. In order to accomplish his design work, Ken had to visit the mills of potential customers where machines of the different types were installed. He would spend several days studying the operation of a machine before embarking on the design of a change over. A certain amount of time was required thereafter to complete the actual drafting and design, *289 during which he needed to have access to office space and drafting facilities. On occasion, he would be required to return to a mill for additional observations or measurements. Ample design facilities could have been made available to Ken at his home in Florida, as well as at Progressive's main office in Massachusetts. [3] However, he set up drafting equipment aboard Top Roll II. Since beginning this project, Ken has designed changeovers for every model of spinning machine, six or seven in all. The Swansons spent much of the period here at issue aboard the boat, traveling or tied up at ports along the Atlantic coast. Their stops included Hilton Head, South Carolina, where they were members of the Sea Pines Plantation Club. While they were traveling and while the boat was tied up at their Florida home, Ken devoted some time on board to his drafting work. From the date of purchase through December 1970, the Swansons took Top Roll II to the following places: 1969
June 5-9
Atlantic City, N.J.; Mystic,
Conn.; Scituate, Mass.
June 10-July 25
Scituate, Mass.
July 26-Aug.4
Norwalk, Conn.; Flushing,
N.Y.; Atlantic City, N.J.; Cape
May, N.J.; Annapolis, Md.;
Portsmouth, Va.; Elizabeth
City, N.C.
Aug. 5-25
Belhaven, N.C.
Aug. 26-30
Wrightsville Beach, N.C.;
Georgetown, S.C.; Beaufort,
S.C.
Aug. 31-Nov. 5
Hilton Head, S.C.
Nov. 6-10
Jekyll Island, Ga.; Daytona
Beach, Fla.; Ft. Pierce, Fla.;
Ft. Lauderdale, Fla.
Nov. 11-30
Ft. Lauderdale, Fla.
Dec. 1-31
Del Ray Beach, Fla.
1970
Jan. 1-13
Del Ray Beach, Fla.
Jan. 14-15
Ft. Lauderdale, Fla.
Jan. 16-Feb.10
Miami, Fla.
Feb. 11-19
Del Ray Beach, Fla.; Indiantown, Fla.;
Ft. Lauderdale, Fla.; Ft. Meyers, Fla.
Feb. 20-Mar.31
Del Ray Beach, Fla.
Apr. 1-May 31
laid up and out of commission
in Ft. Lauderdale, Fla.
June 1-19
Ft. Lauderdale, Fla.
June 20-27
Vero Beach, Fla.; Ft. Lauderdale,
Fla.; Daytona Beach, Fla.; St.
Augustine, Fla; Savannah, Ga.;
Charlestown, S.C.; Hilton
Head, S.C.
June 28-Sept.9
Hilton Head, S.C.
Sept. 10-13
St. Simons Island; St. Augustine,
Fla.; Titusville, Fla.; Frances
Langford's Marina
Sept. 14-Oct.18
Ft. Lauderdale, Fla.
Oct. 19-Nov. 21
St. Augustine, Fla.
Nov. 22-Dec. 31
Ft. Lauderdale, Fla.
*290 Scituate, Massachusetts, is the closest harbor to Rockland, where Progessive's main plant is located. Elizabeth City and Belhaven, North Carolina, are near some of the mills visited by Ken in the course of his design work. Whenever Top Roll II was in Ft. Lauderdale, it was tied up at the Swansons' residence. They had exclusive control and possession of the boat throughout 1969 and 1970. Besides Ken's drafting activities, the boat was used sometimes for fishing and entertaining. The Swansons lived on board whenever they took the boat away from Ft. Lauderdale. Ken traveled extensively on business during the years at issue by automobile and by plane. Progressive paid his expenses for meals, lodging, and transportation on these trips, in approximately the following amounts: 1969
1970
January
$408.11
$ 100.86
February
671.61
105.43
March
202.51
326.85
April
522.10
287.01
May
565.80
72.89
June
96.45
578.57
July
161.69
82.15
August
$206.13
$ 443.97
September
57.09
104.29
October
404.63
523.22
November
169.55
371.00
December
143.70
315.84 The disallowed deductions attributable to the yacht were: 1969
1970
Depreciation
$2,409.00
$4,884.00
Operating expenses
1,987.20
3,304.16
*291 On or about November 3, 1971, copies of the revenue agent's reports for Progressive and the Swansons were sent to the petitioners. These reports raised all of the issues subsequently set forth in the notices of deficiency. On or about March 2, 1972, the shareholders and directors of Progressive held a special joint meeting. The minutes of that meeting recite that in 1969 the shareholders, anticipating Ken's design project requiring him to visit mills up and down the coast, decided to purchase a boat to be used as a "floating engineering and sales office," and that: Because of the economic position of the corporation, Mr. Swanson suggested to the stockholders that he would be willing to bear half of the purchase price and maintenance costs of the boat, and in return, he would get some personal use out of the boat. The idea was praised by the stockholders who saw the proposal as a viable business opportunity for the corporation. It was further agreed that when the boat had achieved its objective, it would be sold and Mr. Swanson and the corporation would each receive one-half of the selling price. The minutes of the 1972 meeting show that it was then deemed desirable, in light *292 of the Internal Revenue Service audit, to reduce the 1969 oral agreement to writing. The following resolutions were passed: VOTED: That the stockholders and directors do confirm the prior acquisition of a boat to be used as a floating engineering and sales office, in order to enable Kenneth P. Swanson to directly approach textile plants along the Atlantic coast. VOTED: That a boat be purchased by Kenneth P. Swanson and the corporation, as tenants in common, one-half of the purchase price of the boat and one-half of the maintenance costs to be borne each by Kenneth P. Swanson and the corporation. VOTED: That when the purpose of the corporation had been achieved, and the need for such a floating engineering and sales office was no longer necessary, the boat would be sold, and the amount received upon the sale be distributed one-half each to Kenneth P. Swanson and the corporation. A written agreement between Progressive and Ken was then adopted, embodying the above resolutions, and dated as of May 2, 1969. Progressive had retained earnings of $582,146 on October 31, 1969, and $583,203 on October 31, 1970. It paid dividends in each year from 1962 through 1970; the aggregate dividends *293 so paid amounted to $110,000. The charter value of Top Roll II during both years was $2,000 per month. ULTIMATE FINDINGS OF FACT 1. Progressive did not acquire or own an interest in Top Roll II, and all expenditures it made to purchase and equip the yacht constituted dividends to the Swansons. 2. Payments of yacht operating expenses by Progressive were not ordinary and necessary business expenses, but were made for the principal purpose of benefiting the Swansons and constituted dividends to them. OPINION In 1969 and 1970, Progressive furnished one-half the purchase price and operating expenses of a yacht, Top Roll II, and the Swansons (Ken and Grayce who were and are, respectively, the president and principal shareholder of Progressive) paid the other half. Respondent argues that Progressive never acquired any interest in the yacht, that it was used exclusively for the Swansons' personal benefit, and that Progressive is, therefore, not entitled to depreciation and operating expense deductions or an investment credit with respect to the Yacht. In the alternative, he argues that section 274 [4] precludes the above deductions and credit. He also alleges that no binding commitment *294 to purchase the yacht prior to April 18, 1969, the termination date for the investment credit provisions (see section 49) has been shown. As to the individual petitioners, he claims that all of Progressive's expenditures on the yacht (including the amount paid toward the purchase price) were constructive dividends to them, or, alternatively, that they received a constructive dividend to the extent of the fair rental value of the corporation's interest therein. The issues are factual and petitioners have the burden of proof. Welch v. Helvering, 290 U.S.lll (1933); Rule 142, Rules of Practice and Procedure of this Court. Our analysis will be simplified if we consider separately questions relating to the acquisition of the boat and its subsequent use. Moreover, we note that such analysis and conclusions herein are based not only upon those factual elements referred to but also upon the entire record herein and our evaluation of the witnesses who appeared before us. A. Acquisition Cost
Respondent's first contention is *295 that Progressive never acquired an interest in Top Roll II and that all amounts contributed by it toward the purchase were constructive dividends to the Swansons. Petitioners have offered evidence which they contend shows that Progressive intended to, and did, become a half owner of the boat. The ordinary rule for computing the amount of a constructive dividend attributable to payments made to or for a shareholder by a corporation is to look to the actual benefit conferred on the shareholder. We have held that retention of ownership of an asset by the corporation defeats the use of the purchase price as the measure of that benefit. Nicholls, North, Buse Co.,56 T.C. 1225, 1240-1241 (1971); International Artists,Ltd.,55 T.C. 94, 108 (1970); Louis Greenspon,23 T.C. 138, 152 (1954), affirmed in part and reversed in part, 229 F.2d 947 (C.A. 8, 1956); [5] but see American Properties,Inc.,28 T.C. 1100 (1957), affirmed per curiam, 262 F.2d 150 (C.A. 9, 1958).[6]
*296 Many of the facts which we have found support respondent's position. First and foremost, the Swansons took title in their own names. Ken was evidently thought by the seller and the insurer to be the owner of the boat, although there is evidence indicating the insurer was aware that Progressive also made premium payments. The Swansons deducted the full amount of sales tax on their individual return. They also claimed gasoline tax credits, while Progressive did not. The boat remained in their possession and control; it was physically located at their Florida home or at their club in Hilton Head much of the time. In fact, no other employees of Progressive ever used the boat for any purpose. The Swansons were actively interested in boating, having owned three smaller craft, including the one which was traded in when Top Roll II was purchased. Petitioners seek to explain the boat purchase by the alleged need for a mobile facility to be used by Ken principally for business purposes. As will be seen, infra, we are not persuaded by this claim of business justification. Nor are we satisfied that petitioners' suggested explanations of all of the above factors are adequate to reduce their *297 cumulative impact. In weighing the evidence, we have been mindful not to confuse circumstances legitimately arising from the Swansons' admitted half ownership with evidence that they possessed the whole. Nevertheless, petitioners have failed to convince us that Progressive ever acquired an interest in Top Roll II as a result of its cash outlays. In particular, we are not swayed by the fact that for its own accounting purposes Progressive treated the transaction as the purchase of an asset rather than the payment of a dividend. The after-the-fact attempt to shore up the petitioners' proposed explanation by reducing to writing the claimed prior approval of the other officers and shareholders, occurring, as it did, subsequent to the receipt of the revenue agent's reports, is entitled to little, if any, weight. Moreover, even if such approval was in fact given, it is not inconsistent with the existence of a dividend. 58th Street Plaza Theatre,Inc.,16 T.C. 469, 476-477 (1951), affd. 195 F.2d 724 (C.A. 2, 1952). We conclude that none of the contributions made by Progressive toward the purchase of Top Roll II and capital improvements thereto resulted *298 in the corporation's acquisition of an ownership interest. All such amounts were expended for the benefit of the Swansons and constitute dividends to them. Our conclusion also sustains respondent's disallowance of depreciation deductions and the investment credit with regard to the yacht. [7] See Nicholls, North, Buse Co.,supra, 56 T.C. at 1238. B. Operating Expenses
Our finding that Progressive did not own a half interest in Top Roll II does not dispose of the question whether subsequent operating costs were ordinary and necessary business expenses to the extent paid by Progressive. Deductions are allowed under section 162 for the "expenses paid or incurred * * * in carrying on any trade or business." Where a shareholder's use of corporate money or property is called into question, expenses are deductible only when the corporation's primary purpose in making the payment *299 is related to its trade or business. International Artists, Ltd.,supra.To the extent that the primary purpose is to benefit a shareholder, the deduction is denied and the shareholder is charged with receipt of a dividend. Crosby v. United States,496 F.2d 1384 (C.A.5, 1974); Sammons v. Commissioner,472 F.2d 449 (C.A. 5, 1972), affirming in part and reversing in part T.C. Memo. 1971-145; United Aniline Company v. Commissioner,316 F.2d 701 (C.A. 1, 1963), affirming T.C. Meo. 1962-60; Challenge Manufacturing Co.,37 T.C. 650 (1962). We are satisfied that Progressive's primary purpose in helping to maintain the yacht was to benefit the Swansons, and that any business reason was entirely "incidental and relatively insignificant." [8]International Artists, Ltd.,supra,55 T.C. at 105. [9]
*300 Petitioners' proffered explanation of the instant transaction is that Progressive's officers and shareholders, desiring to acquire a boat to facilitate Ken's design work, agreed that the Swansons and the corporation would purchase a boat; that it would be put to the anticipated use at the joint expense of the co-owners; and that when the purpose was accomplished, the boat would be sold and the proceeds divided. Petitioners further allege that the boat did in fact serve as a floating workshop, and that over 50 percent of its use during the years before us was in furtherance of Progressive's business. We have difficulty accepting this version of events. The only documentary evidence which supports it stems from the postfacto 1972 meeting of shareholders and directors. Although the changeover project which occupied Ken in 1969 and 1970 has long since been completed, any suggestion that the boat has been sold is conspicuously absent from the record. While the evidence is quite specific as to the travels of Top Roll II, it is quite lacking in convincing detail about the actual activities that took place on board and the relative degrees of business and personal use; for these *301 vital facts, petitioners depend almost entirely on the vague recollections of Ken himself. [10] Finally, the benefit, if any, derived by Progressive from Ken's use of the boat was not commensurate with the added expense it incurred. The boat was in service throughout 1969 and 1970, except during the period before it was delivered, approximately January through May, 1969, and while it was laid up in April and May, 1970. Petitioners claim that the boat was intended to reduce Ken's travel and lodging expenses. During each of the seven months Ken was without the boat, Progressive paid an average of $390 for these expenses. For the 17 months the boat was in use, the average (excluding boat expenses) was approximately $247 per month. To achieve this economy of about $143 per month, or $2,431 over 17 months, the corporation incurred operating expenses of almost $5,300 and a depreciation charge of nearly $7,300. These figures, to put it mildly, cast considerable doubt as to the credibility of petitioners' business justification. [11] We find it much more likely on this record that Progressive agreed to share expenses primarily as an accommodation to the Swansons, and any expectation that the *302 boat would be used on business was wholly incidental and originated with the Swansons, not the corporation. [12]
*303 Respondent also argues that before Top Roll II was purchased, Progressive had an office and an apartment in Greenville, South Carolina (see footnote 3, supra), and the Swansons owned a spacious home, any of which Ken could have used for the same purposes used to explain the acquisition of Top Roll II. Petitioners misconceive the thrust of respondent's argument when they accuse him of second-guessing the business judgment of Progessive's management. To be sure, taxpayers are entitled to conduct their businesses and to deduct the expenses thereof within a broad spectrum of reasonableness. See Newi v. Commissioner,432 F.2d 998 (C.A. 2, 1970), affirming T.C. Memo. 1969-131; Sanitary Farms Dairy, Inc.,25 T.C. 463 (1955). In this context, the availability of alternative means, if those chosen are "ordinary and necessary" or "appropriate and helpful" to some business purpose, is not determinative. Nevertheless, the presence of alternatives is significant for a number of purposes. They help in evaluating the weight and credibility of evidence, *304 in fixing the outer limits of what is ordinary and necessary, and in ascertaining the true nature of the purpose for which payments were made. Here, we think this evidence shows, not that purchasing and operating the yacht was a poor business decision, but that its principal purpose was not related to the corporation's business at all. The latter is clearly relevant to the issue of a constructive dividend. Challenge Manufacturing Co.,supra.We hold that Progressive is not entitled to the claimed deductions and that the Swansons received dividend income equal to the amounts expended. Decisions will be entered for the respondent.
Footnotes
1. Respondent's disallowance of the investment credit claimed with respect to other assets acquired by the corporation was challenged in the petition, but has not been raised since and is deemed conceded by Progressive.↩
2. They concede, in the event we find that Progressive purchased a one-half interest in the yacht, that they are entitled to a deduction for only one-half of the state sales tax paid.↩
3. The record contains insufficient evidence to show that such facilities could not have also been provided in Progressive's space in Greenville, S.C.↩
4. See also section 48(a)(1). All statutory references are to the Internal Revenue Code of 1954, as amended and in force during the years involved.↩
5. The above rule is limited to situations where all parties intend that the corporation actually acquire and hold an interest in the specific property involved, and where that intention is carried into effect. The case where property is wrongfully diverted from a corporation, which retains only a claim against the shareholder for the amount so withdrawn, is to be sharply distinguished. See Elmer J. Benes,42 T.C. 358 (1964), affd. mem. 355 F.2d 929 (C.A. 6, 1966), certiorari denied, 384 U.S. 961↩ (1966). 6. The "irrespective of title" references by this Court in American Properties, Inc. were made in the context of the particular facts of that case which are clearly distinguishable from the facts involved herein. Compare George Proskauer,T.C. Memo. 1971-174↩.
7. Since we have determined that Progressive acquired no interest in the yacht, we do not reach other grounds urged by respondent for denial of the investment credit claimed by Progressive.↩
8. Where the receipt of a benefit by a shareholder from a corporate expenditure is only incidental to the business purpose dividend treatment is not indicated. Sanitary Farms Dairy, Inc.,25 T.C. 463 (1955). Compare Vincent W. Eckel,T.C. Memo. 1974-33↩. 9. Petitioners' heavy reliance on International Artists is wholly misplaced. Aside from a significant number of other distinguishing factors, the premises involved therein were "the sole business premises" of the taxpayer. See 55 T.C. at 101↩. (Emphasis added.)
10. Even if business reasons were more than incidental to the purpose of conferring a benefit on the Swansons, petitioners would have the burden of proving some basis for allocating the expenditures herein between business and personal use. This we find they have failed to do. See International Artists, Ltd.,55 T.C. 94 (1970). Certainly the record is inadequate to support their proposed 50-50 allocation even as to the amount of time↩ devoted to business use; still less are we able to determine what portion, if any, of the total space aboard was available for such use. 11. We realize that this use of average expenses may be misleading due to varying conditions during the period of time involved. However, there is no evidence to indicate that Ken's activities differed substantially between the times the boat was in service and the times it was not. Absent a satisfactory explanation, these figures, even as "ballpark" estimates, may appropriately be used and clearly undermine petitioners' argument. ↩
12. Petitioners have not made any argument against dividend treatment based on Ken's lack of direct stock ownership, such as that these payments were additional compensation to him. We have no difficulty in concluding that the corporation made distributions "with respect to its stock." Section 301. See Nicholls, North, Buse Co.,56 T.C. 1225 (1971); Harry L. Epstein,53 T.C. 459↩ (1969).