J. George Spitz Trust, J. George Spitz, Trustee, et al. [1] v. Commissioner. Spitz Trust v. Commissioner
Docket Nos. 515-68, 652-68, 3265-68, 3266-68.
United States Tax Court
T.C. Memo 1971-8; 1971 Tax Ct. Memo LEXIS 325; 30 T.C.M. (CCH) 43; T.C.M. (RIA) 71008; January 12, 1971, Filed. *325 1. In the factual situation presented, the excess of the fair market value over the price of a 9.3-acre tract of land sold by one corporation (San-Lo Corporation), wholly owned by decedent and his wife, to another (Belle Construction Corporation), wholly owned by a trust created by decedent, constituted a constructive dividend to decedent and his wife and a taxable gift by them to the trust. However, no gift tax liability was incurred as a result of the transaction because the amount of the gift did not exceed the sec. 2521, I.R.C. 1954, exemption and, consequently, no sec. 6651, I.R.C. 1954, addition to tax applied thereto. 2. The transfer of all the stock of Belle Construction Corporation to a trust created on August 20, 1962, was not a gift in contemplation of death within the meaning of sec. 2035, I.R.C. 1954. 44 3. The fair market value of the assets of Belle Construction Corporation, when it was liquidated on November 15, 1963, did not exceed its liabilities; therefore, the sole stockholder, the J. George Spitz Trust, did not realize a taxable liquidating dividend. 4. The fair market value of a 14-acre tract of land did not exceed the price at which it was sold by one controlled *326 corporation (Lo-San Realty Corporation) to another (San-Lo Corporation) on September 4, 1962, and by the latter corporation to decedent on June 1, 1963; decedent did not realize taxable income on either of these transactions. Sandow Holman and James R. Zuckerman, 122 E. 42nd, New York, N. Y., for the petitioners. Jay S. Hamelburg, for the respondent. FEATHERSTON
Memorandum Findings of Fact and Opinion FEATHERSTON, Judge: Respondent determined tax deficiencies as follows: Docket No.
Kind of Tax
Year
Amount
515-68
Income
* 1964
$191,808.96
652-68
Income
1962
70,024.89
1963
14,791.88
3265-68
Estate
88,743.73
3266-68
Gift
1962
4,161.17 In docket No. 3266-68 respondent also determined an addition to tax under section 6651[2] in the amount of $1,040.29. Concessions have been made by both parties, and the issues remaining for decision are as follows: 1. Whether the fair market value of a 9.3-acre tract of land exceeded the price at which it was sold by San-Lo Corporation to Belle Construction *327 Corporation on September 4, 1962; 2. If the value of the 9.3-acre tract exceeded such sales price, (a) whether the excess constituted a constructive dividend to the shareholders of San-Lo Corporation; (b) whether the portion of the excess allocable to Chester Satz, the principal shareholder of the San-Lo Corporation, constituted a taxable gift to the J. George Spitz Trust, the sole shareholder of the Belle Construction Corporation; and (c) whether a section 6651 addition to tax is applicable with respect to the gift tax; 3. Whether the decedent's transfer of the shares of Belle Construction Corporation to the J. George Spitz Trust on August 20, 1962, was a transfer in contemplation of death within the meaning of section 2035; 4. Whether the fair market value of the assets of Belle Construction Corporation exceeded its liabilities at the time of its complete liquidation on November 15, 1963; 5. If question 4 is answered affirmatively, whether Belle Construction Corporation was a collapsible corporation within the meaning of section 341, with the result that the gain on the liquidation is taxable to its sole shareholder, the J. George Spitz Trust, as ordinary income; and 6. Whether *328 the fair market value of a 14-acre tract of land exceeded the prices at which it was sold by Lo-San Realty Corporation to San-Lo Corporation on September 4, 1962, and by San-Lo Corporation to Chester Satz on June 1, 1963; if so, whether the differences between the fair market value on each such date and the sales price constituted constructive dividends to the shareholders of the selling corporations. Findings of Fact General J. George Spitz (hereinafter Spitz) was a legal resident of Poughkeepsie, New York, at the time he filed his petition (docket No. 515-68) as trustee for the J. George Spitz Trust (hereinafter the Spitz Trust), [3] created on August 20, 1962, by Chester Satz (hereinafter decedent) who died on March 14, 1964. Belle S. Satz (petitioner in docket Nos. 652-68, 3265-68, and 3266-68) widow of decedent and the executrix of his estate (hereinafter sometimes referred to as petitioner), was also a legal resident of Poughkeepsie, New York, at the time her petitions were filed. The income tax return of the trust for the fiscal year ended July 31, 1964, and the joint income tax returns of Belle and Chester Satz for 1962 and 1963, as well as the estate and gift tax returns of *329 the Estate of Chester Satz, were all filed 45 with the district director of internal revenue at Albany, New York. Decedent lived for many years in Poughkeepsie, New York, where he was engaged principally in the office equipment business. For several years prior to his death, he also participated in a number of real estate ventures. To handle his real estate business, he organized a series of corporations, including the San-Lo Corporation (hereinafter San-Lo) and the Lo-San Realty Corporation (hereinafter Lo-San) in which he and his wife, Belle Satz, owned all the stock. The 9.3-Acre Tract and Related Issues In 1956, San-Lo purchased a 9.3-acre tract of land situated in the Town of Poughkeepsie for the sum of $38,130. This L-shaped tract of land was located along the east side of U.S. Route 9 (New Route 9), a four-lane major highway which runs the *330 entire north-south length of the Town of Poughkeepsie. While there was no direct access from the land to New Route 9, cars on that highway could freely travel to and from the tract by means of Old Route 9, a two-lane macadam spur. The spur started at the north end of the tract, ran along its west side and rejoined New Route 9 about 150 feet south of the tract. The area between New Route 9 and the Old Route 9 spur formed an island, covered by large trees which obstructed the view of the tract from New Route 9. The frontage of the tract was level with New Route 9 at the north end, and was approximately 6 feet below it at the south end. The land sloped from the Old Route 9 frontage to a small stream, which ran through the middle of the tract, and then rose some 36 feet to the rear of the tract. The 9.3-acre tract was zoned for roadside commercial use. This zoning allowed use of the land for such enterprises as shopping centers, funeral parlors, storage facilities, warehouses, and the like. The available utilities included water, electricity, gas, and telephone. Due to the topography of the land, considerable preparation, including rock removal, drainage, filling, and regrading, was required *331 before the property could be used commercially. Furthermore, in order to regrade the tract properly, additional land, either to the north or to the south, was needed. At the time this land was purchased in 1956, decedent planned to cause San-Lo to construct a warehouse and possibly an outlet for his office equipment business outside the city limits; however, because of the contour of the tract and the stream running through it, the expense involved in preparing it for construction of a warehouse made the project economically impracticable. Efforts were then made to develop the land for some other commercial use. Consideration was given particularly to building a discount-house shopping area, but study of this proposal showed that more land was required in order to make such use feasible. Between 1956 and 1962 decedent, acting on behalf of San-Lo, expended a considerable amount of time in attempting to develop the tract. His efforts in this respect included unsuccessful attempts to purchase the adjoining land, both to the south and to the north of the tract. Finally, in early 1962, he negotiated the provisions of a longterm lease for a 4-acre tract, which was owned by Ronald and Carolyn *332 R. Knapp and was located to the south of, and adjacent to, the 9.3 acres. Thereafter he began arranging for the construction of a shopping center on these two parcels of land. In furtherance of the construction plans, on August 6, 1962, decedent organized the Belle Construction Corporation (hereinafter Belle) and caused all of its stock to be issued to him. Four days later, on August 10, 1962, Belle entered into a 99-year lease covering the 4-acre tract for an annual rental of $10,000 for 55 years with formula increases thereafter. In the meantime, decedent's attorney had been working on arrangements which eventually led to the issuance by the Town of Poughkeepsie to Belle of a deed covering the island between Old and New Route 9, and the land on which the Old Route 9 spur lay. With this acquisition, Belle could remove the trees blocking the view to the 9.3-acre tract. Addition of this 4-acre tract and the area of the spur to the 9.3-acre tract created a site large enough for a shopping center. Shortly thereafter, on August 20, 1962, decedent transferred all of the Belle stock to the Spitz Trust. Under the terms of the trust, the first $25,000 of annual income was to be divided equally *333 between decedent's two children, Sandra S. Hopkins and Lois D. Glass; the next $3,000 was to go to his sister, Charlotte Stone; the next $2,000 to his brother, Kalman Satz; and the balance, if any, was to go to his children equally. Decedent had been giving financial assistance to his brother, who had been ill for some time, as well as to his sister, who was a widow. He was also providing assistance for his daughters, one of whom was having 46 marital problems. He hoped that the income from the trust would eliminate the need for him to provide for the welfare of these family members. At the time of decedent's transfer of the Belle stock to the trust, the only asset on the books of Belle was the 99-year lease on the 4-acre tract; however, plans for the construction of the shopping center were almost complete. On September 4, 1962, San-Lo sold to Belle the 9.3-acre tract for $38,130, the price which San-Lo had paid for the land in 1956. At the time of the sale a shopping center known as Poughkeepsie Plaza was located on New Route 9, about one-half mile from the 9.3-acre tract; another shopping center called Hudson Plaza was being constructed to the west of New Route 9. The next day, *334 on September 5, 1962, Belle, as landlord, entered into a 20-year lease with Stop and Shop, Inc. (Stop and Shop), as tenant, with options for additional terms aggregating 30 years. The lease called for Belle to construct a new shopping center building on the 9.3-acre tract. The basic annual rent was $168,336 for an original term of 20 years. Thereafter the annual rent for the first two 5-year renewals was to be $151,502.40 and for the last four 5-year renewals was to be $134,668.80 per year. Belle also undertook the construction of another building on this property, and executed leases of space therein to Henry L. Raiche for a term of 10 years and 1 month; Household Finance Corporation, for 10 years with an option for an additional 5 years; Farmers & Manufacturers National Bank, for 10 years with renewal options totaling 10 years; and the United States Post Office Department for 5 years with renewal options totaling 6 years. The aggregate rental per year for these four leases was $13,450. In the same month, September 1962, Belle hired John Arborio, Inc., to level and drain the land and do the required excavation of rock and earth; the total cost of his work exceeded $215,000. On November *335 16, 1962, Belle entered into a contract with Frank Rotunno Company (hereinafter Rotunno) for the construction of the shopping center. The center was to consist of two separate buildings: One of the buildings, containing about 125,000 square feet, was to be constructed at a maximum cost of $830,000 in accordance with the specifications of Stop and Shop; the other smaller building, to be occupied by the other four tenants mentioned above, was to be constructed, under an oral agreement, at a maximum cost of $50,000. In addition, during the course of construction, Belle and Stop and Shop agreed to the installation of a restaurant on the premises at a total cost of $147,569. Rotunno was paid a total amount of $959,747.34 for his work. On December 21, 1962, Belle signed a $1,000,000 building loan mortgage with the Poughkeepsie Savings Bank to raise funds for the construction. On July 19, 1963, that mortgage was refinanced by Union Central Life Insurance Company and was increased to $1,030,000. Construction of the Stop and Shop building was completed on May 28, 1963, and the smaller structure was completed on October 1, 1963. Possession of these properties and the payments of initial rent *336 thereon began on various dates between May and November 1963. During the course of the construction work and subsequent to its completion, Rotunno complained that the detailed plans and specifications prepared by the engineer were not completed on time and were substantially different from the plans contemplated by the construction contract which had been signed on November 16, 1962. Various changes were made in the plans during the construction, but the changes were not adequately documented by the parties. Because of the delays and the alleged differences in the plans, Rotunno asserted that it was not bound by the contract price and that it expected to be reimbursed for the extra costs. Rotunno did not state the precise amount of its supplemental claim at that time but asserted that the added costs, due entirely to the changed plans, and the delays caused by the engineer, would amount to several hundred thousand dollars. In connection with the contract dispute, Rotunno and its law firms sent Belle numerous letters asserting rights to further payments. In a letter dated December 16, 1965, Rotunno's attorneys asserted that "in the event that this matter proceeds to litigation, our *337 claims will be for the aggregate of * * * $479,735.70 (increased by such additional items as more details come to our attention) with interest on all items (except on the damages for injury to credit)." Attempts to negotiate an amicable settlement of the claim failed, and Rotunno filed a suit in 1968 in the Supreme Court of the State of New York, Dutchess County, 47 praying for a judgment against Belle in the amount of $358,153.65 plus costs. This claim and related issues had not been resolved as of the date of the trial of the present case. In about October 1963, when the construction work was nearing completion, decedent's health began to fail. Prior thereto he had been alert, active, and athletic. He consulted a doctor and, shortly thereafter, indicated that he wanted to be relieved of any further obligations with regard to the shopping center and, more particularly, the trust. He resigned his position as president of Belle and turned the business over to his attorney and Spitz as trustee. To simplify management of the shopping center, they started considering the possibility of liquidating Belle. Belle's accountants advised Spitz and the attorney that the total amount of the corporation's *338 liabilities exceeded the value of its assets and that, therefore, no adverse tax consequences should be anticipated from the liquidation. On November 15, 1963, Belle was liquidated, and all of its assets were transferred to its sole stockholder, the Spitz Trust, subject to the liabilities of the dissolved corporation. At the time of its liquidation, Belle's assets and liabilities were reflected as follows in a balance sheet prepared for internal use: BELLE CONSTRUCTION
CORP.
Statement of Assets,
Liabilities and Capital
As at November 15, 1963 ASSETS
Cash-Farmers Matteawan
$ 28,403.53
Bank
Cash-1st Savings & Loan
1,750.00
Bank
Deposits
4,000.00
Receivable-State of N.
Y.
Rent Receivable
291.67
Prepaid Land Rent
416.67
Prepaid School Taxes
8,372.25
Due from Stop & Shop,
120.00
Inc.
Building
$1,138,032.06
Small Stores
56,000.00
$1,194,032.06
Less: Accumulated
24,637.80
Depreciation
Total Buildings
1,169,394.26
Restaurant - Under
42,616.87
Construction
Land
38,129.94
Mortgage Financing Cost
33,989.55
Less: Accumulated
566.51
Amortization
Total Mortgage
33,423.04
Financing Cost
*13 Total Assets
$1,326,918.23
LIABILITIES
Loans Payable - San Lo
$ 61,884.94
Corp
Loans Payable - Chester
25,000.00
Satz
Accounts Payable:
Contractor
$ 4,818.31
Architect
6,000.00
Interest on Mortgage to
2,792.33
Nov. 15, 1963
Total Accounts Payable
13,610.64
Security Deposits
1,750.00
Payable
Deferred Rent
7,188.99
Federal and State
594.84
Income Taxes Payable
Mortgage Payable -
27,132.00
Current Portion
Mortgage Payable -
1,189,141.56
Beyond one year
Total Mortgage Payable
1,216,273.56
*13 Total Liabilities
$1,326,302.97
CAPITAL
Capital Stock Issued
$ 30.00
Deficit - August 1,
($2,677.78)
1963
Net Profit From
3,263.04
Operations for the
Period August 1, 1963,
to November 15, 1963
Retained Earnings
585.26
Total Capital
$615.26
*339 The liability to "Contractor," i.e., Rotunno, in the amount of $4,818.31 shown in this balance sheet did not include the unliquidated claim referred to above, because it was in dispute. Following the liquidation of Belle and the distribution of its assets to the trust, decedent's health deteriorated. At first the deterioration was slow, but it later became rapid, resulting in hospitalization. Decedent died of a carcinoma of the lung on March 14, 1964. In the notice of deficiency in docket No. 652-68, respondent determined that the fair market value of the 9.3 acres, when sold to Belle by San-Lo on September 4, 1962, was $297,600, or $259,470 in excess of the amount Belle paid San-Lo. Respondent further determined that decedent realized taxable income as follows: $71,534 of the excess represented a constructive dividend to decedent and his wife; $106,798.69 represented a return of capital, and $81,137.31 represented capital gain. In the notice of deficiency in docket No. 515-68, respondent determined that the assets of Belle at the time of liquidation had a fair market value of $1,844,893, which exceeded the liabilities by $256,106, and that the excess was taxable to the sole shareholder, *340 the trust, as gain upon liquidation. The notice further determined that such gain was taxable as ordinary income to the trust on the ground that Belle was a collapsible corporation under section 341. In the notice of deficiency in docket No. 3265-68, respondent determined that, at the time of decedent's death, the fair market value of the property transferred to the trust by decedent (determined to be $435,402.26) was includable in decedent's estate under sections 2035, 2036, or 2038. Finally, in the notice of deficiency in docket No. 3266-68, respondent determined that the three shares of stock transferred to the trust by decedent on August 20, 1962, had a date-of-gift value of $43,431 rather than $30, the value reported in the gift tax return, and that the difference between the two amounts was a taxable gift The notice further determined an addition to the gift tax of 25 percent of the amount required to be shown as tax on the return on the ground that it was not timely filed. The 14-Acre Tract and Related Issues On June 17, 1960, Lo-San purchased from Walter Lloyd a 14-acre tract of vacant land in Poughkeepsie for the sum of $80,000, This tract had approximately 190 feet of frontage *341 on Route 55, a two-lane concrete state highway. The land was relatively level, with only fair drainage; electricity, gas, water, and a sewage system were available. Due to unfavorable soil conditions, elaborate footings and foundations were required for any building constructed on the land. Decedent used Lo-San to acquire the property in order to protect other real estate investments from claims in the event that losses were incurred in developing the tract. At the time it was acquired, the tract was not properly zoned. Acting on behalf of Lo-San, decedent tried to have it zoned for commercial uses, hoping that it could be developed through the construction of stores, a shopping center, or offices. However, after two years of fruitless negotiations with various discount stores and attempts to deal with other problems associated with zoning and access rights, it was decided that no successful commercial use could be made of the land at that time. On September 4, 1962, Lo-San sold the property to San-Lo for $93,201.31. This purchase price represented the $80,000 originally paid for the land plus an adjustment of $13,201.31 for various expenses which had been capitalized on Lo-San's books. *342 Since decedent had no immediate plans for developing this tract in 1962, he 49 felt that he could safely place this land in San-Lo, which held other real estate. After the sale, San-Lo attempted to dispose of the property. In early 1963 it was listed with various brokers at an offering price of $140,000 or $150,000; however, no offer at any price was received during that period. On June 1, 1963, decedent bought the property from San-Lo for its cost basis of $93,201.31, and continued to list it for sale. This property remained in decedent's estate at his death. The executrix of his estate continued to list the property with brokers, and indicated to them that it would consider any offer in excess of $90,000. No purchase offer was received until May 1964, when the 14-acre tract was sold for $129,500 to a firm of builders, which had been successful in constructing garden-type apartments in New Jersey and wished to establish themselves in New York State. In the notice of deficiency in docket No. 652-68, respondent determined that the fair market value of the 14-acre tract when sold to San-Lo by Lo-San in 1962 exceeded the purchase price by $4,798.69, and that the fair market value of the *343 land when sold by San-Lo to decedent in 1963 exceeded the purchase price by $36,298.69. The notice further determined that the 1962 transaction resulted in a return of capital of $100 and a capital gain of $4,698.69, and that the 1963 transaction resulted in a constructive dividend of $15,080.88 and a capital gain of $21,217.81. Ultimate Findings of Fact 1. The fair market value of the 9.3-acre tract on September 4, 1962, when it was sold by San-Lo to Belle, was $61,000. The fair market value of the tract on November 15, 1963, when Belle was liquidated, did not exceed $200,000. 2. The difference ($22,870) between the fair market value ($61,000) of the 9.3-acre tract and the price ($38,130) which Belle paid San-Lo therefor on September 4, 1962, was a constructive dividend to San-Lo's shareholders, decedent, and Belle S. Satz. 3. The portion of the excess of the fair market value of the 9.3-acre tract over the price which Belle paid therefor was a taxable gift by decedent; however, decedent had not made any prior taxable gifts, and the amount of the September 4, 1962, gift did not exceed the specific exemption allowed by section 2521. 4. Decedent's transfer of his shares of stock in *344 Belle on August 20, 1962, was not a gift in contemplation of death within the meaning of section 2035. 5. The fair market value of Belle's assets at the time of its liquidation on November 15, 1963, did not exceed its liabilities. 6. The fair market value of the 14-acre tract on September 4, 1962, and June 1, 1963, did not exceed the prices at which the land was sold on those dates. Opinion The 9.3-Acre Tract and Related Issues 1. Value The crucial question with respect to the 9.3-acre tract is its fair market value on September 4, 1962, the date of its sale by San-Lo to Belle. Resolution of this question will influence the decisions as to: (1) Whether the decedent received a constructive dividend in 1962 in the form of the excess of the fair market value over the sales price; (2) whether the decedent made a taxable gift to the Spitz Trust, Belle's sole stockholder, in the form of the value in excess of the sales price; and (3) whether the section 6651 additions to tax are applicable. Petitioner contends that the land had a fair market value no greater than the price paid for it by San-Lo in 1956, i.e., $38,130. Respondent determined the fair market value to be $297,600 at the time *345 of this sale. The term "fair market value" means the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy or sell and both being reasonably informed as to all relevant facts. See, e.g., sec. 20.2031-1(b), Estate Tax Regs.; sec. 25.2512-1, Gift Tax Regs.; O'Malley v. Ames, 197 F. 2d 256 (C.A. 8, 1952). Every piece of land is unique, and, in determining its fair market value, an examination must be made of the surrounding area and its usefulness, the topography, accessibility, the size and shape of the parcel in relation to its highest and best use, the development possibilities in the area, comparable sales of land in the immediate vicinity, the zoning requirements, and all other relevant factors. The large number of variables affecting the valuation of real estate and the possible weight to be given to each in a particular transaction 50 make it impossible to determine the value of land with mathematical certainty. The record in this proceeding contains extensive data relating to this 9.3-acre tract, and both petitioner and respondent presented expert testimony concerning its value on the crucial *346 date. Careful consideration has been given to the methods of evaluation used by each expert; the extent of the personal knowledge of each with regard to this particular land on the valuation date; and the thoroughness with which each appraiser examined the factors relevant to the valuation, as well as the unique characteristics of this particular tract. After considering all of these factors in the light of the entire record, we have found as an ultimate fact that the 9.3 acres had a fair market value as of September 4, 1962, of $61,000, or approximately $6,560 per acre. This finding reflects a 60 percent increase in the value of the property between the date of its acquisition in the arm's-length purchase in 1956 and the date of its sale to Belle. While the location of nearby shopping centers quite obviously had made the tract more valuable, it could be efficiently developed for shopping center purposes only by arranging for it to be used as a part of a larger tract and, even then, extensive grading, leveling, and other steps requiring capital outlays were required. Having found that the fair market value of the tract exceeded its purchase price by some $22,870, we must now resolve *347 the tax consequences of this September 4, 1962, sales transaction. 2. Income Taxes - 1962 All of San-Lo's stock was owned by the decedent and Belle S. Satz, his wife, on September 4, 1962, the date on which San-Lo sold the 9.3-acre tract to Belle for $22,870 less than its fair market value. The Spitz Trust owned all of Belle's stock; decedent and Belle Satz owned none of it. Ordinarily, this sale would be regarded as a transaction between the two corporations; yet respondent determined that decedent and Belle Satz as owners of the stock of San-Lo realized taxable income in the amount of the excess of the tract's fair market value over the sales price. In this factual setting, we think the determination correctly reflects the law. Under the general rule of section 301, any distribution of property made by a corporation to a shareholder with respect to its stock, with stated exceptions which are not applicable here, is a dividend includable in the shareholder's gross income to the extent of the corporation's earnings and profits. Any excess is applied against the taxpayer's basis, and any remaining amount over and above such basis is taxable as capital gain. The rule of section 301 *348 as it relates to transfers of property for less than adequate and full consideration is amplified by section 1.301-1(j), Income Tax Regs., which provides, in pertinent part, as follows: Transfers for less than fair market value. If property is transferred by a corporation to a shareholder which is not a corporation for an amount less than its fair market value in a sale or exchange, such shareholder shall be treated as having received a distribution to which section 301 applies. In such case, the amount of the distribution shall be the difference between the amount paid for the property and its fair market value. * * * Although the transfer herein was made, in form, by one corporation (San-Lo) to another (Belle), it was in substance a transfer by San-Lo to individuals, decedent and his wife, who made a gift to the trust of the difference between the land's fair market value and the sale price, and the trust in turn contributed such difference to Belle. Consequently, since decedent and his wife owned San-Lo's stock, the transaction falls within the terms of the regulation. Thus, in Harry L. Epstein, 53 T.C. 459 (1969), a corporation controlled by the taxpayer sold property at less *349 than its fair market value to various trusts created by him for the benefit of his children. The Court applied section 1.301-1 (j), supra, and held that the difference between the price at which the property was sold and its fair market value constituted a distribution to the shareholders stating (at 475): [We] have already determined that the fair market value of the property transferred by [the corporation controlled by the taxpayer] to the trusts exceeded * * * the consideration received * * *. Put another way, [the excess] was transferred * * * to the trusts for no consideration. To this extent, therefore, petitioners in their control [of the corporation] have enjoyed the use of that part of the property by having it transferred for their own purposes to the trusts created by them * * *. They could have enjoyed this no more had it been distributed to them directly. * * * [The] 51 transfer of the property * * * to the trusts * * * constituted, to the extent that the corporation received less than full consideration from such trusts, a constructive distribution of property * * *. The Court explained further (at p. 476) that, since the taxpayer's controlled corporation sold the property *350 to the trusts created by the taxpayer at less than its fair market value, the effect of the transaction was to withdraw the property "from the corporation * * * to the extent that such corporation did not receive full consideration" and make a gift of such property to the trusts. Although the facts of our case are somewhat different from those in Epstein, the same principles apply. The decedent here arranged the entire integrated transaction, and the ultimate beneficiaries of the bargain sale were cestuis of the trust which he had created only a few days previously, on August 20, 1962. His reason for creating the trust was to provide for a channel of income to his family. The trust's only asset was Belle's stock, and the objectives of the trust could be accomplished only if Belle was enabled to proceed with the construction and operation of the shopping center. To the extent that the bargain sale contributed to this cause, the decedent enjoyed the excess of the value of the property over the sales price as much as if such excess had been distributed to him, then given to the trust, and simultaneously contributed by the trust to Belle to provide it with needed capital. Cf. Worcester v. Commissioner, 370 F. 2d 713 *351 (C.A. 1, 1966), affirming in part a Memorandum Opinion of this Court, Equitable Publishing Company v. Commissioner, 356 F. 2d 514 (C.A. 3, 1966), affirming per curiam a Memorandum Opinion of this Court, certiorari denied 385 U.S. 822 (1966); L. L. Silverstein, 36 T.C. 438 (1961); Byers v. Commissioner, 199 F. 2d 273 (C.A. 8, 1952), affirming a Memorandum Opinion of this Court, certiorari denied 345 U.S. 907 (1953). It follows that a constructive dividend was realized in the amount of $22,870, the amount by which the fair market value of the tract exceeded the sales price. In articulating the foregoing rationale, we are not deciding that a bargain sale between two corporations whose stock is owned or controlled by the same individuals will always constitute a constructive dividend. Cf. W. B. Rushing, 52 T.C. 888 (1969), on appeal (C.A. 5, Apr. 20, 1970). It is enough that, under all the circumstances of this case, the bargain sale herein, one step in a larger, integrated transaction, constituted a constructive dividend. Cf. Tollefsen v. Commissioner, 431 F. 2d 511 (C.A. 2, 1970), affirming 52 T.C. 671 (1969), certiorari applied for Oct. 29, 1970. 3. Gift Tax - 1962 As to the applicability *352 of the gift tax to the transaction between San-Lo and Belle, section 2501(a)(1) imposes a tax "on the transfer of property by gift." Section 2511 provides that, subject to limitations not applicable here, the tax shall apply "whether the transfer is in trust or otherwise, whether the gift is direct or indirect, and whether the property is real or personal, tangible or intangible." Under these provisions, quite clearly a gift in the guise of a sale is a taxable transfer. We hold that the constructive withdrawal of assets from San-Lo and the constructive transfer of such assets to the trust to enable it to provide capital for Belle was a taxable transaction under section 2501. [4] *353 See Harry L. Epstein, supra at 475-476. The computation of the amount of the gift tax deficiency determined by respondent in the notice of deficiency in docket No. 3266-68, however, failed to allow the decedent the benefit of the section 2521 specific exemption. In the petition in this docketed case, petitioner alleged that respondent erred in this respect, and she had the burden of proving that decedent had not made prior gifts equal in value to the specific exemption. We think petitioner made the requisite showing. Petitioner introduced testimony that decedent had made no prior gifts to which any of his lifetime exemption was 52 applicable. Respondent did not cross-examine the witness on this point and offered no evidence supporting the denial of the section 2521 exemption. Accordingly, we find that petitioner sustained her burden of proving that decedent is entitled to the gift tax exemption. Since the exemption allowed by section 2521 exceeds the amount of the gift (iii.e., $22,870), no gift tax is owing; and, consequently, *354 the determined addition to tax under section 6651 does not apply. 4. Estate Tax Respondent determined that the value of the property "transferred by the decedent in trust on or about August 20, 1962, is includible in his gross estate * * * as a transfer made in contemplation of death (under the provisions of Section 2035)." [5] To support this determination, respondent relies principally upon the presumption which arises when the transfer is made within three years of the decedent's death, section 2035(b), [6] *355 and argues that petitioner has not carried her burden of proof. We do not agree. Section 20.2035-1(c), Estate Tax Regs., states that the phrase "in contemplation of death" Does not have reference to that general expectation of death such as all persons entertain. * * * A transfer "in contemplation of death" is a disposition of property prompted by the thought of death (although it need not be solely so prompted). A transfer is prompted by the thought of death if (1) made with the purpose of avoiding death taxes, (2) made as a substitute for a testamentary disposition of the property, or (3) made for any other motive associated with death. * * * The guidelines prescribed by this regulation pose a question of fact which requires an examination of all the relevant evidence; the inquiry is directed toward the ascertainment of decedent's dominant motive at the time he made the transfer. United States v. Wells, 283 U.S. 102 (1931). If, by a preponderance of the evidence, it is shown that that motive *356 was not one "associated with death," section 20.2035-1(c), supra, the transfer is not considered to have been made in contemplation of death. In the present case, decedent created the trust on August 20, 1962, and transferred the Belle shares to it for the primary purpose of providing a channel of income for various members of his family - his two children, sick brother, and widowed sister. Prior to the creation of the trust, the decedent had been furnishing some support for these beneficiaries, and the trust merely provided an alternative method of carrying out the obligations he had undertaken. At the time of the transfer, the assets listed on the books of Belle consisted of only a 99-year lease on 4 acres of land which, standing alone, could produce no income. In order to provide the needed income - approximately $30,000 per year - it was necessary for Belle to conduct further business activities; more specifically, the land for the shopping center had to be assembled; the contracts for construction and excavation had to be executed and supervised; and leases had to be negotiated with the various tenants. Steps toward the accomplishment of these objectives had been taken, but much *357 remained to be done. All of these activities required decedent's unique business background. Thus, the transfer was only one part of a total plan which depended for its success on petitioner's continued life. At the time he made the transfer, decedent appeared to be in good health. According to the testimony, he showed no outward signs of illness and had no apparent concern over his health. He was mentally and physically alert and active; and there is no evidence to suggest that he had any inkling of the illness which was soon to seize him. Indeed, it is almost inconceivable that he would have undertaken the ambitious program of assembling the shopping center land and negotiating and carrying out the construction program if he had thought he was soon to become a victim of carcinoma. We think the evidence is clear that it was not until October 1963, about 14 months 53 after the disputed transfer, that decedent became aware of his failing health. Decedent's dominant motives at the time he made the transfer of the Belle stock to the trust were associated with life rather than with death. Therefore, the value of the property at the time of decedent's death is not includable in his gross *358 estate under section 2035 as a transfer in contemplation of death. 5. Trust Income Tax - Fiscal Year Ended July 31, 1964 The correctness of the determination that the Spitz Trust realized taxable income upon the liquidation of Belle depends upon whether the value of Belle's assets exceeded its liabilities at that time. Respondent determined the excess to be $256,106. We have concluded that the assets received by the trust had no net value at the time of the liquidation and that, therefore, the Spitz Trust realized no gain on the liquidation. Once again, we must ascertain the fair market value of property. Since that task requires consideration of the price at which property would be sold by a willing seller to a willing buyer, each knowing the relevant facts, all of Belle's assets and liabilities, whether listed on its books or not, must be taken into account. When Belle was liquidated on November 15, 1963, its assets consisted of the two shopping center buildings and the land on which they were located. The construction of the larger building had been completed on May 28, 1963, and the smaller structure on October 1, 1963; but they had been constructed exclusively with borrowed funds. *359 The corporation owed Union Central Life Insurance Company $1,300,000, and the unliquidated Rotunno claim was pending. Each party presented the testimony of an expert as to the value of the property. In making his appraisal, petitioner's expert, competent and thoroughly experienced in shopping center valuations, valued the property as a leased fee. He capitalized the income over the terms of the leases, adding the November 15, 1963, value of the reversion of the land on the termination of the Stop and Shop lease. He expressed the view that the improvements, built specially for a neighborhood shopping center, would have no economic life beyond 30 years. For the first 20 years, in his opinion, the element of risk with respect to the Stop and Shop lease was relatively low; thereafter the lease is subject to renewal each 5 years, and as time passes there is an increasing likelihood that it will not be renewed. Accordingly, he capitalized the net annual rent from the Stop and Shop building for the first 20 years at 7 percent and the net annual rent for the next 10 years at 9 percent. Taking into account the shorter terms of the leases covering the small building he capitalized the aggregate *360 rent therefrom at 12 percent. In this manner, he computed the total value of the income from the buildings at $1,360,831. To this he added $11,400 as the value of the reversionary interest in the land, based on a November 15, 1963, value of $200,000, [7] bringing the total value of the real estate to approximately $1,372,000. Adding the other book assets of $43,354 and subtracting book liabilities of $1,326,303, he arrived at a net equity of $89,000 in the assets received by the trust, without any adjustment for the unliquidated Rotunno claim. Disregarding the Rotunno claim for the moment, we think the expert's appraisal is basically sound, but it is subject to certain possible adjustments. First, in making hos calculations he charged all the operating expenses - estimated at $60,000 per year, including those for the smaller building as well as the $10,000 per year payable on the 4-acre tract lease - entirely against the Stop and Shop lease income. Second, actual experience with this shopping center indicates that the estimate of operating expenses is somewhat high. Further, he assigned no value to the reversionary interest in the 4 acres covered by the lease, so essential to the feasibility *361 of developing this tract for shopping center purposes in the first instance. Each of these adjustments has relatively small effect, and correcting them would not significantly alter his estimate of the value of the assets. Respondent's expert subtracted his estimate of the annual operating expenses ($55,000) from the gross annual lease income from both the Stop and Shop building and the smaller building and capitalized the total estimated annual net income at 7 1/2 percent, arriving at a value of $1,700,000. 54 Subtracting the balance sheet liabilities from this figure leaves a net equity of $373,697, without regard to the Rotunno claim. This approach makes no distinction *362 between the first 20 years and the remaining period of the Stop and Shop lease. Nor does it distinguish the Stop and Shop lease from the short-term leases on the small building. The $55,000 estimate of expenses is based on published statistics, and they do not take into account the $10,000 payable annually on the leased 4-acre tract. While respondent's expert used the highest percentage appearing in the published statistics to adjust for this last factor, we are not satisfied that the adjustment is sufficient to compensate for this unique situation. As indicated, neither of these valuations of Belle's net equity reflects any adjustment for the contingent Rotunno claim. Respondent contends that it should be ignored because it was not reflected in Belle's balance sheet, arguing that "a purchaser of the shopping center could well have relied upon [that] corporation balance sheet showing a liability due the contractor of $4,818.31 only, and this would be the only claim for which he would be liable to the contractor." We think respondent's position is untenable. The record shows clearly that the balance sheet appearing in our Findings represented only book values and that it did not reflect *363 any verification of these assets. As noted in our Findings, Rotunno complained almost from the outset about the engineer's delays and changes in the original construction plans; it asserted that it was not bound by the construction price, and that it would demand further compensation. At one point, as late as December 16, 1965, Rotunno threatened suit for an additional payment in excess of $479,735.70. There is no basis in this record for a conclusion that the Rotunno claim was spurious in any respect. The construction project was evidently managed poorly. The small building was constructed pursuant to an oral agreement at an estimated cost of $50,000. A restaurant was installed at an apparent cost of nearly $150,000, evidently without any detailed written agreement. Such procedures cedures are the grist for cost disputes. Indeed, in the course of the trial respondent's counsel emphatically demanded the production of the file of the attorney handling the Rotunno suit for the Spitz Trust; after the file was produced and examined, counsel for respondent made no further attack on the bona fides of the claim. Instead, he asks us to ignore it on the ground that it might have been hidden *364 from a purchaser. However, to say the claim should be ignored would require a disregard of that portion of the definition of fair market value which assumes that both the hypothetical buyer and seller have reasonable knowledge of the facts. In more pertinent terms, it would require disregard of the practical fact that the Spitz Trust acquired Belle's properties subject to the Rotunno claim. On the record before us, we are convinced that weight must be given to the claim - ultimately asserted in a suit for over $358,000 - in arriving at the value of the distributed property, for the claim would have hung like a dark cloud over a possible sale to an informed purchaser. Using our best judgment in the light of the whole record, we have concluded that Belle's liabilities exceeded the value of its assets on November 15, 1963. [8]
The 14-Acre Tract and Related Issues The final issue to be resolved is the fair market value of the 14-acre tract when it was transferred by Lo-San to San-Lo *365 on September 4, 1962, and when transferred by San-Lo to the decedent on June 1, 1963. Respondent determined that the fair market value exceeded the consideration paid for the land in each transaction with the result that decedent and Belle Satz, as sole shareholders of Lo-San and San-Lo, realized taxable income in the respective transactions to the extent of the excess. The valuation issue is purely factual. As noted in our Findings, Lo-San purchased the tract on June 17, 1960, in an arm's-length transaction and incurred capitalized expenditures thereon in the total amount of $13,201.31. On September 4, 1962, decedent caused the property to be transferred to San-Lo in consideration of $93,201.31, a sum equal to Lo-San's basis for the property. This transfer followed two years of fruitless work in attempting to develop the tract. After numerous unsuccessful efforts to sell the tract while it was held by San-Lo, decedent caused the tract to be transferred to him on June 1, 1963, at the price - $93,201.31 - which San-Lo had paid for the property. On the theory that 55 the tract was steadily increasing in value, respondent determined that it had a value of $98,000 on September 4, 1962, *366 and $129,500 on June 1, 1963. To support the reasonableness of the selling prices used for the two transfers, petitioner introduced the testimony of a local real estate appraiser who was thoroughly familiar with the property on both dates. Indeed, the property was listed with him for sale at the time Lo-San acquired it in June 1960. Based upon evidence of the sales price of comparable properties a few months prior to September 4, 1962, and taking into account other relevant factors, the appraiser advised the Court that as of that date the property had a value of approximately $5,800 per acre or a total value of $81,200. Adjusting this figure for a general increase of 5 percent for all real estate values in the area, he expressed the view that the September 1, 1963, value was $85,300. Respondent offered no expert testimony as to the value of this tract. He relies almost entirely upon the sale to the New Jersey apartment builder, subsequent to the decedent's death, at a price of $129,500. In his brief, he acknowledges that, as a general rule, events taking place after the valuation date are not taken into consideration, see e.g., Central Trust Co. v. United States,, 305 F. 2d 393, 403 (Ct. Cl. 1962), *367 but insists that we give the sale controlling weight. Taking into account the 1960 purchase price, the location of the property, the difficulties encountered in developing it for commercial use, the repeated efforts to sell the tract over an extended period of time, and the sales of comparable properties, together with the opinion of the real estate appraiser and all other relevant evidence, we have found as an ultimate fact that the fair market value of the tract did not exceed $93,201.31 on either September 4, 1962, or June 1, 1963. Accordingly, the factual premise for the determined deficiencies in respect of the transactions affecting this property is fatally defective. Decisions will be entered under Rule 50 in docket Nos. 515-68, 652-68, and 3265-68. Decision will be entered for petitioner in docket No. 3266-68. Footnotes
1. The proceedings of the following petitioners are consolidated herewith: Estate of Chester Satz, Deceased, Belle S. Satz, Individually and as Executrix, docket No. 652-68; Estate of Chester Satz, Deceased, Belle S. Satz, Executrix, docket Nos. 3265-68 and 3266-68.↩
*. In this docket the fiscal year of petitioner, the J. George Spitz Trust, ended July 31, 1964.↩
2. All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.↩
3. The title "J. George Spitz Trust" is a misnomer. J. George Spitz did not create the trust; rather he was named as trustee of a trust created by Chester Satz. The respondent, however, issued the notice of deficiency in the name of the J. George Spitz Trust, and the parties have continued to use the designation throughout these proceedings.↩
4. The gift tax notice of deficiency (docket No. 3266-68), without stating any reason therefor, determined that "the 3 shares of stock in Belle" transferred in trust on or about August 20, 1962 "had a date-of-gift value of $43,431.00." At that time, Belle's only asset was a 99-year lease covering 4 acres of land on which annual rent in the amount of $10,000 was payable. Standing alone, the 4-acre lease had no substantial value. On brief respondent does not seek to support the notice of deficiency but bases his plea solely on the theory articulated in the above text. Consequently, we have treated the grounds for the gift tax asserted in the notice of deficiency as abandoned.
5. Respondent also determined that the value of the property is includable in the decedent's gross estate under secs. 2036 or 2038, but offered no evidence and presented no argument on brief to support such determinations. We treat the determinations under secs. 2036 and 2038↩ as abandoned by respondent. 6. Secs. 2035(a) and (b) are, in pertinent part, as follows: (a) General Rule. - The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer * * * by trust or otherwise, in contemplation of his death. (b) Application of General Rule. - If the decedent within a period of 3 years ending with the date of his death * * * transferred an interest in property * * * such transfer * * * shall, unless shown to the contrary, be deemed to have been made in contemplation of death * * *.
7. This value of $200,000 for the land as of November 15, 1963, reflects the opinion of the local real estate appraiser called by petitioners. While this figure is substantially greater than the September 4, 1962, value of $61,000 discussed above, Arborio regarded and filled the tract to the approximate level of Route 9 as part of the construction program. The spur and island between the tract and New Route 9 had been acquired, providing higheay frontage of 277 feet and making the total holding substantially more valuable.↩
8. The determination that Belle had no net worth makes it unnecessary to decide whether or not Belle was a collapsible corporation within sec. 341, for there is no gain on liquidation to be taxed to the shareholder.↩